Argued at Pendleton, November 2, 1921, reversed January 17, 1922.

# KLEINSCHMIDT *v.* CENTRAL TRUST CO. ET AL.

### (203 Pac. 598.)

**Specific Performance—Oral Contract With Deceased Promisor must be Clearly Established.**

1.   A party seeking specific performance of an oral contract made by a promisor, since deceased, must establish the terms of the agreement by clear and satisfactory evidence before the relief will be granted.

**Specific Performance — Not Decreed Where Terms of Contract are Uncertain.**

2.   It is a fundamental rule of specific performance that it will not be decreed where the contract is not certain in its terms, though, generally speaking, uncertainty in a subsidiary part will not prevent specific performance if the main particulars are sufficiently certain.

**Specific Performance—Evidence Held to Sustain Plaintiff's Claim That Original Business had Belonged to His Father.**

3.   In a suit for specific performance of a contract, which plaintiff claimed his father had orally made to pay plaintiff the par value of his stock in a corporation, evidence *held* to sustain plaintiff's claim that the business taken over by the corporation had belonged to the father, so that the father's contributions thereto were not advancements to the plaintiff.

**Specific Performance—Weight of Evidence Held Contrary to Plaintiff's Testimony as to Agreement With Defendants.**

4.   In a suit against the executor and other heirs of plaintiff's father to compel specific performance of an alleged oral contract to pay plaintiff the par value of certain stock held by him, the weight of evidence *held* to contradict plaintiff's testimony that the executor and the other heirs had agreed to make the payment, and that when the corporation was dissolved the representative of the executor stated he would make the payment the next day if the plaintiff brought his certificate along.

**Corporations—Two Sole Stockholders may Impress Funds After Dissolution With Trust for One of Them.**

5.   Though the funds of a dissolved corporation after payment of the creditors, including the claims of the stockholders against the corporation, would be distributed by the law between the stockholders in proportion to their holdings, it was competent for the two stockholders who owned all of the stock to make an agreement that one of them should be paid the par value of his stock in full before even the claim of the other against the corporation was paid, and to impress a trust for such payment upon the corporate funds.

**Specific Performance—Evidence Held not to Show Agreement to Pay out of Specific Funds.**

6.   In a suit for specific performance of an oral contract by plaintiff's father, since deceased, to pay the plaintiff the par value

of his stock in a dissolved corporation, evidence *held* not to show that the agreement made by the father was to pay for plaintiff's stock out of the proceeds of the sale of the corporation's assets, so that no trust was impressed upon the proceeds of such sale in plaintiff's favor.

**Specific Performance—Personal Agreement of Testator to Reimburse for Corporate Stock can Only be Enforced by Claim Against Executor.**

7. An oral promise by plaintiff's deceased father to pay the par value of plaintiff's stock in a dissolved corporation, without an agreement to make such payment from the funds of the corporation, imposed only a personal liability on the father, which can be enforced after his death only by claim against his executor.

From Baker: GUSTAV ANDERSON, Judge.

In Banc.

This is a suit to enforce the specific performance of an oral agreement alleged to have been made between the plaintiff and his father concerning the distribution of moneys remaining after the payment of all the creditors, except one, the father, of the Eastern Oregon Hardware Company, once an Oregon corporation but now dissolved.

Charles F. Kleinschmidt, the plaintiff, is the son of George W. Kleinschmidt, now deceased. Mary L. Kleinschmidt and Emma Kleinschmidt Willits are sisters of the plaintiff. The Central Trust Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Albert W. Schwartz is an assistant trust officer of the Central Trust Company. The Basche-Sage Hardware Company is a corporation and has its principal place of business in the City of Baker, Oregon. The Citizens National Bank is a corporation organized under the national banking laws and conducts a bank in Baker. The Baker Loan & Trust Company is a corporation and it maintains a bank in Baker.

George W. Kleinschmidt had for a long time been a resident of Cincinnati, and we infer from the record

that most of his business life had been spent in the hardware business. In about June, 1915, George W. Kleinschmidt furnished the plaintiff with money with which to seek a location for a hardware store in the northwest, with the result that a hardware store was established in Baker, Oregon, and on September 2, 1915, the doors of the store were opened for business. The business was conducted under the name of Kleinschmidt Hardware Company. The plaintiff together with his family moved to Baker and made that place his home. George W. Kleinschmidt each year, up until the time of his death, spent about six months in Baker and about six months at his home in Cincinnati. The uncontradicted evidence is that when George W. Kleinschmidt was in Baker he acted as manager of the hardware store and the employees treated him as such manager; but when George W. Kleinschmidt was in Cincinnati the plaintiff acted as manager and during such time the employees looked upon the plaintiff as manager. The plaintiff was without means of his own. George W. Kleinschmidt furnished all the moneys for the establishment of the hardware business.

The hardware store continued to be operated under the name of Kleinschmidt Hardware Company until July 25, 1918, when, at the instance of George W. Kleinschmidt, a corporation known as the Eastern Oregon Hardware Company was organized, and thenceforth the business was conducted in the name of that corporation. The Eastern Oregon Hardware Company was organized with a capital stock of 500 shares of the face value of $100 each. George W. Kleinschmidt subscribed for 285 shares and Charles F. Kleinschmidt for 95 shares. Although two other persons subscribed for the remaining 120 shares of

capital stock, we do not understand that any of such remainder was actually issued to any person. W. H. O'Bryan at one time was employed by the corporation and was working under an agreement which provided that 10 shares of stock should be issued to him and upon the performance of certain conditions should become his property. We understand that the 10 shares of stock so issued to O'Bryan were assigned to him by George W. Kleinschmidt out of the 285 shares for which the latter had subscribed. However, O'Bryan did not perform the conditions specified in the agreement and the stock reverted to George W. Kleinschmidt. In March, 1919, the Eastern Oregon Hardware Company, acting through George W. Kleinschmidt, entered into an oral agreement with E. W. Becker, an experienced hardware man, under the terms of which Becker agreed to work for the corporation for $175 per month; and the agreement further provided for the issuance of five shares of stock to Becker to be held by him on certain conditions and with the further understanding that if Becker was discharged from the employment of the corporation he should be paid $500 for the five shares of stock and the stock should thereupon be surrendered. An agreement was also made between Virgil Daniels, another experienced hardware man, and the corporation acting through George W. Kleinschmidt. The terms of the agreement with Daniels were identical with those of the Becker agreement.

On October 20, 1919, the stock-book showed that 274 shares were held by George W. Kleinschmidt, 95 shares by C. F. Kleinschmidt, 10 shares by E. W. Becker, and a certificate for one share had been made out and was ready for issuance to S. A. Armitstead. As previously explained Becker and Daniels

were employed by the corporation under identical agreements. George W. Kleinschmidt delivered to Becker, as security for the agreement made between them concerning Becker's employment, the same 10 shares that had been previously surrendered by O'Bryan. The corporation was dissolved on October 21, 1919. Becker participated in the stockholders' meeting at which a resolution was adopted authorizing the dissolution of the corporation, and at such meeting Becker voted the ten shares of stock held by him. Armitstead was one of the original subscribers to the stock, but apparently he participated in the organization of the corporation mainly for the purpose of making up the necessary number of persons for the formation of the corporation. The one share which was embraced by the certificate made out to Armitstead, but not delivered to him, was in reality owned by George W. Kleinschmidt. Therefore, we may say that 380 shares of the capital stock of the Eastern Oregon Hardware Company were issued and were outstanding at all times from the date of the organization of the corporation until the date of its dissolution; and we may also say that George W. Kleinschmidt owned 274 shares free from claims by others, and that the plaintiff held 95 shares in his own name. We may further say that George W. Kleinschmidt was in reality the owner of the one share made out in the name of Armitstead, and that George W. Kleinschmidt was also the owner of the 10 shares held by Becker, subject only to an equity owned by Becker. In other words, the 380 shares of stock which had been issued were owned by George W. Kleinschmidt and the plaintiff, the former holding 285 shares and the latter holding 95 shares.

After the formation of the corporation the plaintiff continued to act as manager when his father was in Cincinnati, but George W. Kleinschmidt acted as manager when he was in Baker. In about February, 1919, George W. Kleinschmidt came from Cincinnati to Baker and he remained in Baker until about June, 1919, when he and the plaintiff went to Portland, Oregon. We understand that the sole purpose of going to Portland was to find a purchaser for the hardware store, for from the time of the arrival of George W. Kleinschmidt in Portland he was engaged in seeking a purchaser until finally on September 12, 1919, he entered into a contract with Geo. L. Jubitz for the sale of the hardware store. The plaintiff remained with his father in Portland most of the time until 1 o'clock on the morning of September 13, 1919, when he went to California.

The Jubitz contract was made in writing with George W. Kleinschmidt as the party of the first part and Jubitz as the party of the second part. Neither the Eastern Oregon Hardware Company nor any individual other than Jubitz and Kleinschmidt is a party to the contract. The writing opens with a recital that—

"the party of the first part is the owner and holder of 285 shares of the capital stock of the Eastern Oregon Hardware Company," and that 380 shares of the capital stock "have been subscribed for and issued"; that the party of the first part "is about to purchase and acquire all of the remainder of the stock and thus become the sole owner of the entire stock of said corporation"; and that the corporation "is indebted to sundry persons, firms and corporations, which indebtedness it is unable to pay when due in the ordinary course of business, and said party of the first part being desirous of disposing of all of the

103 Or.—9

property of said corporation and winding up and discontinuing its business and realizing as much as possible, over and above what may be required for the purpose of paying the debts and liabilities of said corporation and the expense incident to selling its property and winding up and discontinuing said business."

After the recitals come the stipulations. The party. of the second part

"agrees to take immediate possession of the store and business of said Eastern Oregon Hardware Company and all of its property of every kind and description except its book accounts which are to be retained by said party of the first part, and forthwith proceed to take an inventory of the stock of merchandise of said corporation at the invoiced cost price thereof plus freight, and said party of the second part agrees to pay fifty-five (55) cents on the dollar of the total or aggregate amount of such invoiced cost price plus freight and in addition thereto said party of the second part also agrees to pay said party of the first part one half (½) of any amount realized from the sale of said merchandise in excess of fifty-five (55) cents on the dollar of the cost thereof plus freight, the payment for said merchandise to be in the following manner:

"(a) Said party of the second part shall first use such money as may be required for the payment of current expenses of taking inventory, disposing of said merchandise and liquidating said business and the payment of all the debts and liabilities of said corporation.

"(b) After the payment of said debts and liabilities in full, one half of the excess or overplus of the amount realized from the sale of said merchandise over and above said fifty-five cents on the dollar of said invoiced cost plus freight less $600 to cover salary and incidental expenses of the party of the second part shall be paid over to said party of the

first part as soon as the amount thereof is definitely ascertained.''

The party of the first part further "agrees to forthwith furnish" Jubitz a list of the debts of the corporation and the names of the creditors. The parties agree also that Jubitz

"shall have and receive from the sale of said stock of merchandise in payment and as full compensation for all of his time, attention and services of every kind performed by him in and about the selling of said merchandise and the winding up and liquidation of said business in addition to said expenses as above provided, the one half of such sum as may be realized from the sale of said merchandise in excess of fifty-five per cent of the invoiced cost price thereof plus freight.''

On September 15th Jubitz left Portland for Baker carrying with him a letter signed by George W. Kleinschmidt and addressed to E. W. Becker and Virgil Daniels advising them that Jubitz

"will take charge of the stock of the Eastern Oregon Hardware Company for the purpose of making an exact and fair inventory of same, turning this stock into cash, pay up all the claims against the company and eventually liquidate the business.''

Kleinschmidt also advises the addressees that Jubitz

"is familiar with the understanding I have with you and just as soon as the inventory is finished will pay you the amount due you under the agreement.''

George W. Kleinschmidt left Portland for Cincinnati on September 17th, and on September 30, 1919, he died in Cincinnati, leaving as his only heirs the plaintiff, Mary L. Kleinschmidt and Emma Kleinschmidt Willits. The will was executed under date of May 10, 1916. A bequest of $500 was made to

Mary Sund, a family servant; the sum of $200 was bequeathed to the Children's Home; the sum of $1,500 was bequeathed to each of the two daughters. The jewels and personal effects of the deceased mother of the two daughters were given to the daughters, and the testator's jewelry was bequeathed to the plaintiff. The residue of the estate was devised and bequeathed to the three children—

"to be divided equally among them, share and share alike, provided, however, as I have made advancements from time to time to my children, and as I may hereafter make further advancements to them, I direct that all such advances, as shown by my private ledger, shall be considered as advancements and shall be deducted from the respective share of each of my children and no interest shall be charged for the sums so advanced."

A corporation then known as the Central Trust & Safe Deposit Company, but now known as the Central Trust Company, was made executor. The estate left by George W. Kleinschmidt is worth, after the payment of debts and expenses of administration, between $61,000 and $75,000.

On October 1, 1919, the plaintiff, presumably on receipt of notice of his father's death, left California and went to Cincinnati. We understand, too, that the plaintiff's wife accompanied him to Cincinnati. Jubitz, upon his arrival in Baker, took charge of the hardware store and of the property, except the book accounts, belonging to the corporation. Early in October, 1919, Jubitz opened negotiations for the sale of the store and property of the Eastern Oregon Hardware Company to the Basche-Sage Hardware Company, and an agreement was subsequently reached whereby the Basche-Sage Hardware Company was to take over all the property of the Eastern Oregon

Hardware Company.   The Central Trust Company as executor of George W. Kleinschmidt's will, after first obtaining the approval of the probate court in Ohio, expressed its assent to the sale; and then under date of October 18, 1919, after having complied with the requirements of the Bulk Sales Law, Jubitz as seller and the Basche-Sage Hardware Company as buyer entered into a written agreement whereby the buyer agreed to purchase the stock of goods, wares and merchandise in the store for 72% of the "flat cost," and the "fixtures, tools, warehouse, lease and auto-truck" for $3,000.   The buyer paid $1,000 to the seller and agreed to pay "the further sum of $29,000, being a part of the balance" of the purchase price, in cash at such time as the seller caused to be delivered to the buyer a good merchantable title to all the property.   The seller agreed to "use due diligence in procuring for said buyer and in delivering to it a good merchantable title," but it was further agreed that "such delivery shall be made within sixty days," and in the event the seller failed so to do the $1,000 paid was to be refunded to the buyer and the additional sum of $1,000 was to be paid as liquidated damages.   The seller agreed that within sixty days he would pay—

"all lawful claims against said goods, wares and merchandise and said other personal property, and the whole thereof, will be in all respects free and clear from any lawful liens, encumbrances or claims whatsoever, all of said creditors as disclosed by said list will be paid, and the seller will furnish to the buyer satisfactory evidence of the satisfaction of all the claims of said creditors."

The buyer agreed to pay the balance of the purchase price upon receipt of a good merchantable title

and upon being satisfied "as to the payment of all the claims of said creditors." The buyer was given the right at its option to assume possession and control of the property at any time after the payment of $29,000. The list of creditors prepared by Jubitz under date of October 6, 1919, included 57 creditors holding claims against the Eastern Oregon Hardware Company based upon open accounts and notes aggregating $39,303.80. Included in this aggregate indebtedness were four promissory notes executed by the Eastern Oregon Hardware Company to George W. Kleinschmidt and amounting in all to $6,133.73, and the further sum of $9,527 due George W. Kleinschmidt on an open account, making the total of $15,660.73 due George W. Kleinschmidt from the Eastern Oregon Hardware Company. These notes were dated March 10, 1919; and April 10, 1919, is the date of the last credit on the open accounts as shown by the books of the Eastern Oregon Hardware Company.

The executor was advised of the negotiations with the Basche-Sage Hardware Company. Albert W. Schwartz as the assistant trust officer of the Central Trust Company, executor, after conferences with the plaintiff and the latter's two sisters, left Cincinnati for Baker accompanied by the plaintiff; and they arrived in Baker probably on the night of October 20th. Early in the morning of October 21st Schwartz and the plaintiff presented themselves at the law offices of Nichols & Hallock, a firm of attorneys who were representing the Basche-Sage Hardware Company and Jubitz. On that day formal steps were taken for the dissolution of the Eastern Oregon Hardware Company. All the papers for the dissolution were prepared by Nichols & Hallock and in their

offices.   The stockholders' meeting and the meeting of the board of directors were held in the offices of Nichols & Hallock.   A special stockholders' meeting was held at 7:30 P. M. on October 21st for the purpose of electing a board of directors and taking such corporate action as might be necessary to effect a sale to the Basche-Sage Hardware Company and for the further purpose of dissolving the corporation. Schwartz as proxy and acting under a power of attorney from the executor, represented and voted the 274 shares which appeared from the stock register to be owned by George W. Kleinschmidt.   The plaintiff assigned one of his shares to Schwartz in order that the latter might represent some stock in his own right; and so the plaintiff voted 94 shares and Schwartz one share in his own right.   Becker voted 10 shares.   In the language of the minutes of the stockholders' meeting all "of the issued and outstanding" stock as disclosed by the stock register, was represented "either in person or by proxy."   Schwartz, the plaintiff, and Becker were elected directors.

At the meeting of the stockholders a resolution was adopted ratifying the contract made between Jubitz and the Basche-Sage Hardware Company, and authorizing the president and secretary of the Eastern Oregon Hardware Company to make and deliver to the Basche-Sage Hardware Company the necessary instruments for the conveyance of the property owned by the Eastern Oregon Hardware Company.   The stockholders adopted another resolution authorizing the dissolution of the corporation and directing that the corporate existence of the company be extinguished "as soon as may be" following such action as may be necessary to effect a sale to the Basche-Sage Hardware Company.

A special meeting of the directors was held at 8:30 P. M. on October 21st, for the following purposes: (1) Election of officers; (2) to act upon the proposed sale to the Basche-Sage Hardware Company; (3) to act upon the agreement between George W. Kleinschmidt, as president of the Eastern Oregon Hardware Company, and Becker; and to act upon a similar agreement with Daniels; (4) to consider and act upon the dissolution of the corporation; (5) to consider and act upon a proposition to assign for collection accounts receivable.

Schwartz was elected president of the Eastern Oregon Hardware Company, and the plaintiff was elected and served as secretary-treasurer. The directors adopted resolutions approving the contract made between Jubitz and the Basche-Sage Hardware Company, authorizing the officers of the Eastern Oregon Hardware Company to execute all papers necessary to effect a transfer to the Basche-Sage Hardware Company, approving the contracts made by George W. Kleinschmidt, as president of the Eastern Oregon Hardware Company, with Becker and Daniels, and authorizing the fulfillment of these contracts by the payment of $500 to Becker and the payment of a like sum to Daniels, and assigning to Nichols & Hallock for collection all the accounts receivable appearing on the books of the Eastern Oregon Hardware Company.

Under date of October 21, 1919, the Eastern Oregon Hardware Company, acting by Schwartz as president and by the plaintiff as secretary, by a writing formally transferred to the Basche-Sage Hardware Company all the property which Jubitz had agreed to sell. Subsequently, under date of January 2, 1920, the corporation commissioner issued a certificate of dissolu-

tion showing that the Eastern Oregon Hardware Company had been dissolved.

On the morning of October 22d the plaintiff demanded that he be paid $9,500, claiming that his father had agreed that he would receive that amount upon the sale of the property of the Eastern Oregon Hardware Company. The demand was refused, and then on October 23d the plaintiff began this suit against the Central Trust Company as executor of the will of George W. Kleinschmidt, deceased, the Citizens National Bank, Albert W. Schwartz, The Eastern Oregon Hardware Company, the Basche-Sage Hardware Company and Geo. L. Jubitz.

In addition to the original complaint the plaintiff filed two amended complaints. In the original complaint the plaintiff alleged that on September 12, 1919, he and his father

"entered into an oral contract wherein it was understood and agreed between them that the said corporation might be so wound up and dissolved and its assets sold and disposed of and all of its obligations paid, and that in consideration of his consent and agreement thereto the plaintiff should be paid the sum of $9,500, being the par value of his said 95 shares of stock, and wherein and whereby it was further agreed that in consideration of the said winding up of the said corporation as aforesaid and the payment to plaintiff herein of the sum of $9,500, that this plaintiff should be charged with said sum of $9,500 against his share of the estate of his said father, George W. Kleinschmidt, when the said estate might be administered in due course of law. That acting under said understanding and agreement, * * the said deceased placed George L. Jubitz in full possession of all the assets of the defendant Eastern Oregon Hardware Company and in full control of its affairs and authorized and empowered him to sell and dispose of the assets of said corporation and to

satisfy and pay all obligations of said corporation for the purpose of winding up the affairs of said corporation, and that the said Jubitz ever since said time has been and still is in charge of and in control of the assets and moneys and the conduct of the business of the said Eastern Oregon Hardware Company by virtue thereof, and has since sold and disposed of the stock of goods and merchandise belonging to said corporation to the Basche-Sage Hardware Company."

The plaintiff further alleged in his original complaint

"in said agreement between plaintiff and his said father his said father agreed that the said sum of $9,500 should be paid to the plaintiff herein by the said Eastern Oregon Hardware Company as a condition precedent to the said dissolution and winding up of the affairs of said corporation."

The original complaint concluded with a prayer by asking among other things that the contract

"made and entered into by plaintiff and his father * * be specifically enforced according to its terms"; and that the defendants be "required to pay the plaintiff the said sum of $9,500."

On December 1, 1919, the plaintiff filed an amended complaint. Among other paragraphs in the first amended complaint is the following:

"That owing to ill health and physical infirmities the said George W. Kleinschmidt deemed it necessary to lessen his business cares and responsibilities, and on or about the twelfth day of September, 1919, plaintiff consented to and did enter into an agreement with the said George W. Kleinschmidt in order that the said business cares and responsibilities of his said father, who resided in the State of Ohio, might be lightened, and by said agreement between plaintiff and his said father it was understood and plaintiff consented that the said Eastern Oregon Hardware

Company might be wound up and dissolved, that the said George W. Kleinschmidt would take over from plaintiff the said 95 shares of the capital stock of said corporation then owned by plaintiff, and that plaintiff would sell and assign the same to his said father, at their par value in cash payable out of the first funds which said corporation might realize in any manner in the winding up and dissolution of the same as aforesaid, and that plaintiff should thereby be relieved of any and all liability as a stockholder in said corporation from and after the time of his said surrender and transfer of said stock to his father, and that plaintiff would retire from the position of general manager of said corporation forthwith to seek other employment, and that the said payment to plaintiff of said sum of $9,500 for his said stock should be available to plaintiff at once in order that he might maintain himself and family during any possible period of employment or engage at once in other business therewith; that the said matter of winding up and dissolving the said corporation should be undertaken at once, and that the defendant George L. Jubitz should take possession of the said business for and on the behalf of said George W. Kleinschmidt to that end; and that the said payment of said sum of $9,500 to plaintiff as aforesaid might be charged as, and should be, an advancement to plaintiff out of his share of the estate of his father when said estate might be administered in due process of law.   By said agreement it was further understood and agreed between plaintiff and his said father that should there be any deficiency of assets to pay any liability or liabilities of the said Eastern Oregon Hardware Company that such and any and all deficiency should be paid at once by plaintiff's said father, and that plaintiff would be wholly protected therein. That all of said matters in this paragraph set forth were well known and understood by the said father of plaintiff, were agreed and assented to by both plaintiff and his father as aforesaid, and that plaintiff has in all things fully and duly performed each

and every act and thing by him to be done and performed under and by virtue of the said contract and agreement.''

In this pleading it is also alleged that pursuant to the plaintiff's agreement with his father, the latter placed Jubitz in possession of the property with directions to wind up the business, and that pursuant to such directions Jubitz has sold the business. The plaintiff further alleged that pursuant to the agreement between himself and his father a meeting of the stockholders was held and a resolution was adopted authorizing the dissolution of the corporation, and that a like resolution was adopted by the board of directors ''and that said defendants and each and all thereof then and there well knew that all of said proceedings dissolving said corporation'' were ''had and done pursuant to and in accordance with'' the contract alleged to have been made between the plaintiff and his father. It is alleged that a demand was made upon the Eastern Oregon Hardware Company, Schwartz, Jubitz and the executor that the plaintiff

''be paid the sum of $9,500 out of cash assets then in their possession belonging to said Eastern Oregon Hardware Company and out of the estate of the said George W. Kleinschmidt.''

The plaintiff further alleged:

''That prior to the holding of said meeting by said stockholders and said directors whereat the dissolution of said corporation was effected the said defendants promised and agreed with plaintiff that if he would bring up to said meeting his said certificate of 95 shares of capital stock of said corporation and duly indorse the same that the said Central Trust Company as executor of the estate of George W. Kleinschmidt would in all things carry out the con-

tract in behalf of said estate, and in further consideration thereof and relying thereon and believing that the said executor would comply with the terms of said contract, plaintiff again consented as aforesaid to said action so to dissolve said corporation, and after said proceedings so to dissolve were completed plaintiff produced his said certificate of shares,"

and tendered it to the defendants in such manner as they might require, and "then and there demanded that he be paid the said $9,500," but such demand was refused. The prayer of the first amended complaint like that of the original complaint was that the contract "so made and entered into by plaintiff and his father be specifically enforced according to its terms."

The Basche-Sage Hardware Company and the Citizens National Bank joined in an answer in which they admitted that the Basche-Sage Hardware Company purchased the property of the Eastern Oregon Hardware Company and paid the purchase price to Jubitz, but these two defendants denied substantially all the remaining allegations of the first amended complaint.

The Central Trust Company and Schwartz joined in an answer in which, among other things, they denied that the plaintiff and his father made any agreement concerning the payment of any sum to the plaintiff.

Jubitz and the Eastern Oregon Hardware Company filed separate answers; and each of these two defendants traversed the averments made by the plaintiff concerning the alleged contract between the plaintiff and his father.

The new matter in the several answers was denied by replies, and the cause was tried on the first

amended complaint, the answers and the replies to these answers.

The testimony of Kathleen L. Kleinschmidt, Mary L. Kleinschmidt and Emma Kleinschmidt Willits was taken in Cincinnati, Ohio, by deposition; but all the other witnesses testified in the presence of the trial judge.

After the evidence was all in and the cause submitted to the court for decision, the court, on February 18, 1921, rendered a written opinion in favor of the plaintiff, and stated that "the contract substantially as pleaded has been established."

On February 21, 1921, the plaintiff filed a motion for permission to file a second amended complaint "in order that his allegations may follow the facts proved on the trial, and conforming said allegations thereto." The proposed second amended complaint was tendered with the motion. On February 24, 1921, the court allowed the motion and permitted the second amended complaint to be filed on the ground that

"said cause was tried in all things the same as it must have been tried if the complaint or first amended complaint had contained the same allegations as those of the amended complaint."

No evidence was offered after the filing of the second amended complaint, and no additional pleading was filed by any of the defendants; and nothing more was done until March 2, 1921, when the court filed findings of fact, conclusions of law and a decree for the plaintiff.

In the second amended complaint the plaintiff alleged:

"That at the time of the organization of said Eastern Oregon Hardware Company it was under-

stood and agreed by and between the said George W. Kleinschmidt and plaintiff that the said George W. Kleinschmidt should be elected as and perform the duties of President of the said corporation and that plaintiff should have the local management, and should act as general manager and superintendent of the said corporation in all respects and that he should give all his time and energy to the conduct of its affairs and to the exclusion of all other matters, and that he should receive as compensation therefor an annual salary as a part of the expense of said business in the sum of $2,100 and that when the said corporation was so organized, the said understanding and agreement was put into effect, and up to the time of his death the said George W. Kleinschmidt was the president of said corporation and this plaintiff acted as general manager thereof until the above named defendant, George L. Jubitz, took possession of the said business at the time and under the circumstances hereinafter set forth; that the said understanding and agreement between said George W. Kleinschmidt and this plaintiff provided that the employment of plaintiff by said Eastern Oregon Hardware Company as its manager should be permanent.

"That owing to ill health and physical infirmities the said George W. Kleinschmidt deemed it necessary to lessen his business cares and responsibilities, and to that end and on or about the twelfth day of September, 1919, the said George W. Kleinschmidt and this plaintiff at the request of said George W. Kleinschmidt, made and entered into an agreement wherein and whereby it was understood and agreed that the business and existence of the said Eastern Oregon Hardware Company might be wound up and said company dissolved, and that all its assets should be reduced to lawful money in other words, to cash, and all its outstanding accounts receivable collected, and all its liabilities fully paid; and that thereupon the remaining assets of said company should be divided between plaintiff and his father, who were

then and there the only shareholders in said company, as follows: To plaintiff should go the par value of his said stock, to wit: the sum of $9,500 and all the remainder to his father; and it was then and thereby further understood and agreed that plaintiff should at once retire from his position as general manager of said corporation in order that upon receipt of his said share of said net assets so to be derived from said closing up of said business, he might seek other employment, or be enabled to go into other business therewith; that the matter of so closing and winding up of the said affairs of said Eastern Oregon Hardware Company should be entered upon at once, and that a contract for and on behalf of plaintiff and his said father should be made and entered into with said defendant George L. Jubitz for the said closing out and winding up the said affairs of the said corporation pursuant to and in furtherance of the said agreement between father and son, the plaintiff herein, as aforesaid. And it was then and thereby further understood and agreed as aforesaid that the receipt by plaintiff of said sum of $9,500 and his said use and ownership thereof should be an advancement in that amount out of the estate of his said father when said estate of his father, the said George W. Kleinschmidt, might be administered according to law. That by said understanding and agreement it was further understood and agreed by and between plaintiff and his father that should there be any deficiency in the assets of said corporation to pay any liability or liabilities of the said corporation that in such case each and all of said liabilities should be paid at once by plaintiff's said father, and that plaintiff would be wholly protected therein. That all of said matters were well known to and understood by both parties to the said agreement and understanding, were agreed and fully consented to by both father and son, and that plaintiff has in all things duly and fully performed each and every act and thing by him to be done and performed under and by virtue of the

terms and conditions of said contract and agreement.''

REVERSED.

For appellants there was a brief over the name of *Messrs. Nichols & Hallock,* with oral arguments by *Mr. James H. Nichols* and *Mr. Blaine Hallock.*

For respondent there was a brief over the names of *Mr. William Smith* and *Mr. John L. Rand,* with an oral argument by *Mr. Smith.*

HARRIS, J.—The plaintiff has alleged in his original and in each of the two amended complaints that he and his father orally agreed that the Eastern Oregon Hardware Company should be dissolved and that the plaintiff should be paid $9,500. When testifying as a witness the plaintiff stated that he and his father agreed that the corporation should be dissolved, its assets converted into cash, and the merchandise creditors paid. The plaintiff also testified that it was agreed that he should receive $9,500 out of the assets of the corporation and that this sum should be paid to him before the payment of $15,660.-73, due from the corporation to George W. Kleinschmidt; and, furthermore, the plaintiff testified that his father agreed that if the assets of the corporation were insufficient to pay all the debts of the corporation he, the father, would supply the necessary funds to make up for the deficiency. The defendants not only deny that any contract was made for the payment of $9,500 to the plaintiff but they also deny that there was any agreement that the amount should be paid out of the assets of the corporation, even though it is assumed or held that a contract of some kind was made.

1, 2. The first important inquiry is: Was there an agreement of any kind between the plaintiff and his father for the payment of $9,500 to the plaintiff? The second important inquiry is: If there was an agreement for the payment of $9,500, what were the terms and conditions of that agreement? The contract, if there was one, rests wholly in parol, and the alleged promisor is dead; and, consequently, the terms of the agreement must be established by clear and satisfactory evidence before specific performance will be granted (*Leadbetter* v. *Price, post,* p. 222 (202 Pac. 104, 106); and, although generally speaking, uncertainty in a subsidiary part of an agreement will not prevent a decree for specific performance if the main particulars are sufficiently certain, nevertheless one of the fundamental rules of specific performance is that performance will not be decreed where the contract is not certain in its terms: 25 R. C. L. 218, 219. In *Colson* v. *Thompson,* 2 Wheat. 336, 340 (4 L. Ed. 253), the rule is expressed thus:

"The contract which is sought to be specifically executed, ought not only to be proved, but the terms of it should be so precise as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy."

This statement of the rule was approved by this court in *Feenaughty* v. *Beall,* 91 Or. 654, 668 (178 Pac. 600). Inasmuch as we must now examine the evidence to ascertain whether or not the plaintiff has met the requirements of the rules governing suits for specific performance of contracts, perhaps it will be of assistance if, before examining the details, we

first give an outline of some of the main features of the story contained in the record, even though such outline may require some repetition.

On September 2, 1915, a hardware store was opened in Baker, and it was conducted under the name of Kleinschmidt Hardware Company. George W. Kleinschmidt furnished the money used in establishing the business. George W. Kleinschmidt had his home in Cincinnati, Ohio, but each year he spent about six months in Baker. The plaintiff moved to Baker and made that his home. Plaintiff worked in the store as manager when his father was not in Baker; but the latter acted as manager when he was in Baker. A corporation known as the Eastern Oregon Hardware Company was organized on July 25, 1918, and thereafter the hardware business was conducted in the name of that corporation. The plaintiff subscribed for and held 95 shares of stock. George W. Kleinschmidt subscribed for 285 shares of stock. George W. Kleinschmidt was made president of the corporation, and the plaintiff was elected treasurer with a stipulated salary of $175 per month. However, after the organization of the corporation, just as before its organization, plaintiff acted as manager of the business when his father was absent, but when the latter was in Baker he assumed control of the business. In June, 1919, the plaintiff and his father went to Portland for the purpose of disposing of the hardware store; and finally on September 12, 1919, George W. Kleinschmidt made a contract with George L. Jubitz whereby the latter was to take possession of all the property of the Eastern Oregon Hardware Company, except the book accounts, and dispose of the goods, wares and merchandise and pay the creditors of the corporation. Jubitz sold to the

Basche-Sage Hardware Company all of the hardware and also the other property of the Eastern Oregon Hardware Company, except the book accounts.

Creditors of the Eastern Oregon Hardware Company held claims aggregating $47,400.79, including $15,660.73, due George W. Kleinschmidt. If the indebtedness due George W. Kleinschmidt is excluded the aggregate of the claims held by creditors was $26,740.06. Apparently October 3, 1919, is the date when the negotiations reached the point where the parties understood that the Basche-Sage Hardware Company would buy the property owned by the Eastern Oregon Hardware Company. The store was kept open for business by Jubitz until October 3d, and up until that time the sales for cash and on credit amounted to $2,192.57. Jubitz received from the Basche-Sage Hardware Company $35,316.05 for the stock of hardware, $3,000 for the warehouse building, tools and truck, and $394.37 on account of unearned premiums of fire insurance policies turned over to the Basche-Sage Hardware Company. In other words, the total receipts charged by Jubitz against himself were $40,902.99. After the sale to the Basche-Sage Hardware Company, Jubitz first paid those who were creditors at the time he assumed control over the business. This indebtedness, exclusive of the claims of George W. Kleinschmidt, amounted to $26,740.06 and that was the amount actually paid by Jubitz. The expenses incurred by Jubitz up to October 3d amounted to $809.30, and expenses incurred subsequent to that date aggregated $725.19, or a total of $1,534.49 which Jubitz also paid. In other words, Jubitz received the sum of $40,902.99 for the property of the Eastern Oregon Hardware Company, and out of the receipts he paid

the sum of $28,274.55, leaving a balance of receipts over disbursements amounting to $12,628.44. At this stage of the calculation it will be noticed that George W. Kleinschmidt has not yet been paid any part of the $15,660.73 due him.

Under the terms of the contract between Jubitz and George W. Kleinschmidt the former was entitled to deduct a certain amount for expenses, and to receive a certain sum as compensation. When the contract was performed by Jubitz it was ascertained that he was entitled to receive $5,244.43. This amount due Jubitz was paid to him out of the funds belonging to the Eastern Oregon Hardware Company, but it was not paid out of the $12,628.44 left in the hands of Jubitz after paying all the creditors, except George W. Kleinschmidt, and certain expenses incurred in conducting the business. The defendants contend that the $5,244.43 should be charged against the $12,628.44; and then the defendants argue that if such charge is so made not enough will remain to pay the plaintiff $9,500, and that therefore specific performance must be denied on the theory that equity will not attempt to enforce specific performance unless the contract can be completely performed. It may be assumed that if there had been no controversy between the plaintiff and his sisters, Jubitz would have deducted and retained $5,244.43 out of the $12,628.44 and turned over the balance to whomsoever it should have been delivered; but because of the controversy that arose out of the claim made by plaintiff, and for the purpose of protecting the Basche-Sage Hardware Company, Jubitz was paid out of other moneys belonging to the Eastern Oregon Hardware Company. Although it is true that Jubitz was not paid out of the proceeds derived from the

sale made to the Basche-Sage Hardware Company, nevertheless the fact remains that Jubitz was paid, and was paid out of moneys belonging to the Eastern Oregon Hardware Company.

In the course of the trial the parties stipulated that there was the sum of $12,013.51 in the Citizens National Bank to the credit of Schwartz as president of the Eastern Oregon Hardware Company, $651.89 in the Baker Loan & Trust Company to the credt of the Eastern Oregon Hardware Company, and Liberty Bonds belonging to the Eastern Oregon Hardware Company of the face value of $350 in the custody of the Baker Loan & Trust Company, and $2,195.48 on deposit with the Central Trust Company from collections made on the book accounts and promissory notes owned by the Eastern Oregon Hardware Company. It was also stipulated that all of the indebtedness of the Eastern Oregon Hardware Company had been paid except the $15,660.73 due George W. Kleinschmidt. The book accounts and bills receivable amounted to about $11,000. Some of the book accounts and bills receivable have been paid, but there is no evidence showing how much of the total of $11,000 has been paid. The three banks have in cash belonging to the Eastern Oregon Hardware Company or its successors $14,860.88, and the only remaining assets are the Liberty Bonds of the face value of $350, and the book accounts and bills receivable of an unknown value. If the cash in the banks is first applied to the indebtedness due George W. Kleinschmidt no moneys will be immediately available to the plaintiff, and possibly there will never be enough money to pay the full sum of $9,500. If, however, the indebtedness due George W. Kleinschmidt is subordinated to the claim of the plaintiff and priority is

given to the plaintiff, then more than enough moneys will be available to satisfy the claim of the plaintiff. One of the principal questions to be decided, therefore, is whether the plaintiff and his father agreed that the plaintiff should receive out of the corporate funds $9,500 before the payment of $15,660.73 to the father.

The plaintiff contends that he and his father agreed that the Eastern Oregon Hardware Company should be dissolved and that the former was to receive $9,500 out of the corporate assets in consideration of his consent to the dissolution of the corporation. The plaintiff says that the contract with Jubitz was made for the purpose of carrying out the agreement made between the plaintiff and his father. The plaintiff together with his wife and children left Portland for California at 1 o'clock A. M. September 13, 1919, and on October 1st, the plaintiff went from California to Cincinnati, Ohio. The plaintiff went to California to live and gave no further attention to the affairs of the Eastern Oregon Hardware Company until after the death of his father. The plaintiff declares that on his arrival in Cincinnati he told his sisters and Schwartz about the agreement made with his father, and that he and Schwartz went from Cincinnati to Baker with the understanding upon the part of the sisters and Schwartz and the plaintiff that the plaintiff was to receive $9,500 upon the dissolution of the corporation. A meeting of the stockholders of the Eastern Oregon Hardware Company was held in Baker on October 21, 1919; and on the same date a meeting of the directors was held and at both meetings resolutions were adopted authorizing the dissolution of the corporation. The plaintiff participated in both meetings. The plain-

tiff also asserts that the persons who participated in the dissolution proceedings on October 21st, were aware of the agreements made between the plaintiff and his father, and that it was understood by all the persons who participated in the dissolution proceedings that the steps for the dissolution of the corporation were being taken for the purpose of carrying out the agreement between the plaintiff and his father. The plaintiff says, furthermore, that on October 21st, he was told to bring his certificate of stock to the offices of Nichols & Hallock the next morning and receive $9,500 in fulfillment of the agreement with his father. The defendants deny that the sisters consented that the plaintiff should receive $9,500, and deny that Schwartz and the plaintiff made the trip from Cincinnati to Baker with the understanding upon the part of Schwartz or the sisters or the plaintiff that the plaintiff should receive $9,500 upon the dissolution of the corporation. It is also denied that the steps for dissolving the corporation were taken for the purpose of carrying out the alleged agreement between the plaintiff and his father, and the defendants further deny that the plaintiff was told that he would be paid $9,500 for the surrender of his stock certificate.

3. Before we attempt to determine whether the plaintiff and his father made any agreement on September 12, 1919, let us ascertain, if we can, the position in which each stood on that day. On the one side it has been argued that the hardware store was established by the father for the plaintiff but that the plaintiff had made such a failure of the business that the father was obliged to take it over in order to save as much as possible out of the wreck and to reimburse himself for the large sums of money which he

had advanced to the plaintiff. In other words, it is contended that the hardware store when opened under the name of Kleinschmidt Hardware Company was owned by the plaintiff, but that the father had advanced to the plaintiff all the moneys that had been paid into the business. It is alleged by the Central Trust Company and Schwartz in their answer that the father made advancements to the plaintiff amounting to $57,000, and it is argued that in view of the terms of the will which the father had previously executed and in view of this large amount so advanced to the plaintiff it is not probable that the father agreed to pay the sum of $9,500 for the stock and to give it priority over the father's claim, especially when the father alone held enough stock to have enabled him to compel a dissolution of the corporation and under the law could have compelled the application of corporate assets to the payment of the indebtedness due him from the corporation before distribution to stockholders. On the other side it is argued that all the moneys paid to the plaintiff by his father were either birthday, or wedding presents, or the like, or were for use in the hardware store and that the hardware store was in truth owned by George W. Kleinschmidt alone until the organization of the Eastern Oregon Hardware Company.

There are some circumstances which unexplained and standing alone give color to the theory that the son owned the hardware store; but the clear weight of the evidence points to the conclusion that the father was the real owner. In his original complaint the plaintiff, when referring to the book accounts, speaks of the Kleinschmidt Hardware Company, as

"the Kleinschmidt Hardware Company, which said Kleinschmidt Hardware Company consisted of plaintiff only doing business under that name." In this connection it is proper to say of the language in the original complaint that this pleading was prepared hurriedly in order that service might be made upon Schwartz before he left Baker for Ohio and so as to tie up at the earliest possible moment the moneys in the Baker banks and prevent all moneys and books of the Eastern Oregon Hardware Company from being removed beyond the jurisdiction of the Oregon courts; and that circumstance must be borne in mind whenever the language of the original complaint is compared with the language of the two amended complaints.

The Eastern Oregon Hardware Company was organized for the sole purpose of taking over the hardware business which had been previously conducted under the name of Kleinschmidt Hardware Company. The corporate records show that the plaintiff submitted to the Eastern Oregon Hardware Company over his signature a proposal to transfer to the company all the assets of the Kleinschmidt Hardware Company. "I being the owner of all said" assets, subject to the liabilities of the Kleinschmidt Hardware Company for the sum of $38,148.35. The proposal required the corporation to assume all the liabilities of the Kleinschmidt Hardware Company. The proposal fixed the value of the assets at $57,438.10 and the liabilities at $19,289.75, leaving $38,148.35 as the net worth "which sum of $38,148.35," in the language of the proposal,

"is to be paid to me by your company as follows: The assumption by your company and agreement to settle and pay a personal obligation of mine to

George W. Kleinschmidt in the sum of $28,500 and the issuance to me as fully paid up of 95 shares of the capital stock of your company heretofore subscribed by me.''

The corporation accepted the proposal of the plaintiff.

The corporate records also show that George W. Kleinschmidt proposed to the corporation

''to cancel as fully paid and satisfied, the personal obligations of Charles F. Kleinschmidt heretofore assumed by you in the sum of $28,500,''

as the consideration for the 285 shares of stock for which George W. Kleinschmidt had subscribed. The corporation accepted this proposal. According to the corporate records the plaintiff owned all the assets of the Kleinschmidt Hardware Company and transferred them to the corporation with the agreement that the corporation would assume all the liabilities of the Kleinschmidt Hardware Company, including an indebtedness of $28,500 owing to George W. Kleinschmidt, and that the 95 shares of stock for which the plaintiff had subscribed would be issued to him as fully paid. The indebtedness of $28,500 due George W. Kleinschmidt was settled by the issuance to him of the 285 shares of stock for which he had subscribed. The plaintiff testified that his father told him at a time when the business was being conducted under the name of Kleinschmidt Hardware Company that in order to avoid the difficulties which had been encountered in obtaining credit from wholesalers on account of the father being in Cincinnati so much of the time he (the father) would write to the wholesalers and state to them that the plaintiff owned the business. The plaintiff says that in truth he did not own any interest in the hardware store, but that

his father was the sole owner. The plaintiff also says that the record made at the time of the organization of the corporation was for the purpose of making the transfer of the assets consistent with previous outward appearances. If there was no evidence besides that already mentioned, possibly we would not be justified in concluding, in the face of the corporate records, that George W. Kleinschmidt, and not the plaintiff, was the owner of the hardware store prior to the organization of the corporation; but the testimony of F. L. Hubbard sets the matter at rest. Hubbard is a lawyer residing in Baker. He was the attorney for the Kleinschmidt Hardware Company until the organization of the Eastern Oregon Hardware Company. He prepared the legal papers required for the organization of the Eastern Oregon Hardware Company. He first met George W. Kleinschmidt in 1916 or 1917; and Hubbard says: "George W. Kleinschmidt came to my office two or three times a week at least whenever he was in Baker from the time I first met him, * * until after the incorporation." Hubbard says that George W. Kleinschmidt always referred to the hardware store as "this business of mine down here." Hubbard testified that in the summer of 1918 George W. Kleinschmidt came to his office and "said that he had decided to incorporate that business"; and that Kleinschmidt subsequently directed the witness to prepare the necessary papers and "he gave me the name he wanted it to go by." Kleinschmidt told Hubbard that the name Kleinschmidt (on account of the feeling aroused by the war) "was making a difference with the business"; and "he wanted to get a name that had some local color to it," and furthermore "he wanted to get some local people interested

in there,'' and ''he proposed to sell some stock to local people.'' Hubbard stated that he drew up ''that stock subscription'' and wrote in the number of shares, including 95 shares for the plaintiff, which were to be subscribed by the several subscribers, all under the direction of George W. Kleinschmidt. Hubbard further testified that George W. Kleinschmidt told him that he had $28,500 ''in that business down there invested and that he proposed to take stock out par value for that amount to himself and that the business at that time inventoried something like $38,000, and that this stock that went to Charles F. Kleinschmidt represented the difference between what he had invested in the company and what the assets of the company were at that time.'' The evidence shows that the assets of the Kleinschmidt Hardware Company inventoried approximately $38,-000 net. If it be assumed that George W. Kleinschmidt had invested $28,500 then the assets were, on July 25, 1918, worth $9,500 in excess of the amount actually invested. This increase, counsel for the plaintiff say, is accounted for by the general increase in prices caused by the war. Hubbard also says that George W. Kleinschmidt told him:

''I want to treat Charlie right in this matter. He says, 'Yes, the only thing he has received out of this so far is expenses. In other words, he has run the business here and has simply paid his personal expenses and the expenses of his family, that is everything he has had out of it and everything else has remained in the business,' and he says, 'I want to treat him right on it and I want to make up for whatever he might be entitled to over and above what he has received'; and then he says, 'I want him to have a block of stock in this and I believe if he has he will take more of a personal interest in it and give it better attention than he has.' ''

Hubbard declared that George W. Kleinschmidt was the head of the business when in Baker, and

"employees and myself always went to him for instructions or to find out what was wanted. When he was gone we went to Charles F."

Hubbard further testified that the entries in the minute-book of the corporation showing the proposal of the plaintiff to sell the hardware stock of the corporation and the proposal of George W. Kleinschmidt to cancel the indebtedness of $28,500 were written in the minute-book pursuant to directions given by George W. Kleinschmidt; and that when he asked George W. Kleinschmidt why he had the plaintiff make a statement that the plaintiff owned the hardware store, George W. Kleinschmidt in effect said:

"Of course you know this business down here owes various bills and has various bills coming in. 'Now,' he says, 'this has always gone down here as though it was Charles Kleinschmidt, under the name of Charles Kleinschmidt'; and he says, 'In order to carry that out and carry it into this incorporation so that no question can be raised afterwards in regard to the bills due the Kleinschmidt Hardware Company and the bills the Kleinschmidt Hardware Company owe, and the people they have been doing business with, we will just carry that right along and into the corporation,' he says, 'and then after that it will be, everything will be Eastern Oregon Hardware Company.' "

We conclude from the evidence that George W. Kleinschmidt was the sole owner of the business which from September 2, 1915, to July 25, 1918, was conducted under the name of Kleinschmidt Hardware Company, and that the plaintiff was a mere employee with authority to act as manager in the absence of George W. Kleinschmidt; that the 95 shares of stock,

issued to the plaintiff upon the organization of the Eastern Oregon Hardware Company, became, when delivered, the absolute property of the plaintiff; that the 95 shares represented the difference between the cash which George W. Kleinschmidt had paid for the property then on hand and the increased values produced by war conditions; and that, among other reasons, the father caused the 95 shares to be issued to the son because the latter had up until that time received nothing for his services except the living expenses of himself and family, and because the father thought that if the son held stock of his own in the corporation he would take a personal interest in the business.

In support of the allegation that plaintiff had received advancements amounting to $57,000 the defendants introduced 51 checks signed by George W. Kleinschmidt for various amounts totaling $54,986.37. These checks cover a period beginning with October 30, 1911, and ending with December 26, 1918. The first check which is drawn for a considerable sum is dated June 18, 1915, and was for $2,000. The twelve checks issued prior to that check are for comparatively small sums ranging between $19.45, the smallest, to $500, the largest. Only one of the 51 checks was drawn after July 25, 1918, and that one was for $423. It is not our purpose to attempt to decide just how much of the moneys represented by the 51 checks was used in the business, which up to July 25, 1918, was owned entirely by George W. Kleinschmidt, or how much, if any, was expended for the personal use and benefit of the plaintiff; but some of the checks were drawn payable to manufacturers and wholesalers from whom goods, wares and merchandise had no doubt been bought for the

store; and every check payable directly to the plaintiff and drawn subsequent to June 15, 1915, was, with the single exception of the check for $423 and dated December 26, 1918, deposited in a Baker bank to the credit of the Kleinschmidt Hardware Company, thus tending to show that these checks were used in the hardware business. Possibly some of the 51 checks represent advancements, and possibly none of them represent advancements. It is not necessary for us to decide how many, if any, represent advancements. It is obvious, however, that at least most of the moneys represented by the 51 checks issued subsequent to June 15, 1915, were used in connection with the business which was owned solely by George W. Kleinschmidt; and, consequently, it would be a gross injustice if any of such moneys so used in the business should be charged against the plaintiff as advancements. Moreover, when we remember that every one of those 51 checks, except the one for $423, had been issued prior to July 25, 1918, and that George W. Kleinschmidt had already made his will, the very fact that on that date George W. Kleinschmidt caused stock, which at that time was worth $9,500, to be issued to the plaintiff, is very persuasive evidence that George W. Kleinschmidt did not regard the whole of the $54,563.37, covered by the first 50 checks, as advancements to the plaintiff. If any of the 51 checks did in truth represent advancements, the aggregate sum is not so large as to constitute evidence tending to show the improbability of the making of the alleged agreement.

4. The testimony given by the plaintiff is important, and especially that portion of it which relates to the terms of the alleged agreement of the father to pay $9,500. Perhaps it will aid us in appraising

the value of the plaintiff's testimony concerning the alleged agreement with his father, if we first examine the claims made by him with reference to what occurred in Cincinnati before he and Schwartz left for Baker, and also with reference to what occurred in Baker after Schwartz and the plaintiff arrived there.

The plaintiff says that after he reached Cincinnati he informed his sisters that his father had guaranteed that he would receive $9,500 for his stock when Jubitz disposed of the hardware business, and that after he had given that information to his sisters he and they met with Schwartz in an office "at the Central Trust Company"; that "my eldest sister" told Schwartz

"that I had an agreement with my father that I was to be paid dollar for dollar for my stock, namely $9,500 of the Eastern Oregon Hardware Company stock. Mr. Schwartz turned to my sister and says, 'Mary, do you agree to this?' And she says, 'I do.'

On cross-examination the plaintiff testified:

"I told Mr. Schwartz that I had an agreement with my father that I was to have at the consummation of the sale of the Eastern Oregon Hardware Company $9,500, which was dollar for dollar for my stock, and Mr. Schwartz turned to my sisters and asked them if they agreed"; and Schwartz then said, "All right, if we agreed to it we would go out there and wind up the business and you will get your money."

In brief, the plaintiff contends that it was agreed between himself and his sisters that he and Schwartz should go to Baker, wind up the business of the corporation, and that then the plaintiff should receive $9,500. The two sisters and Schwartz contradicted the testimony of plaintiff. Schwartz and the two

103 Or.—11

sisters say in substance that the plaintiff claimed that his father guaranteed that he would pay dollar for dollar for his stock after the sale of the property of the Eastern Oregon Hardware Company; that the plaintiff, in the language of Schwartz, "wanted an understanding from us that we would pay him the $9,500 and told him that he would have to file his claim like any other creditor." Schwartz and the plaintiff's sisters emphatically declare that they did not agree to pay $9,500 upon the consummation of the sale to the Basche-Sage Hardware Company. The two sisters did consent, however, to the executor paying the expenses of the plaintiff and Schwartz to and from Baker, because it was deemed necessary that the plaintiff go to Baker and take part in the corporate proceedings for the reason that he was the secretary, had the corporate seal, and was a stockholder. It is not necessary to discuss the violent conduct of which two of the witnesses accuse the plaintiff, except to say that we have not overlooked the evidence; nor are we unmindful of the fact that the plaintiff did not ask for an opportunity to deny the charges. We think that the preponderance of the evidence supports the version given by Schwartz and the two sisters of the plaintiff.

The plaintiff testified in substance that all the persons who participated in the proceedings for the dissolution of the corporation knew that his father had guaranteed to pay him dollar for dollar for his stock upon the consummation of the sale of the hardware business; for, in the language of the plaintiff, "I told them on the night of the 21st and the morning of the 22d, or afternoon," that "Mr. Schwartz understood the agreement I had with my father, and that we came out with the understanding that I would

be paid $9,500 for my stock.'' It will be remembered that Becker held 10 shares as collateral security. Jubitz carried out George W. Kleinschmidt's agreement with Becker, and on the morning of October 22d Jubitz paid Becker $500, and the latter surrendered the certificate of stock held by him. When the plaintiff and his father were in Portland on September 12th, the plaintiff's stock certificate was in a safety deposit box in Baker, and evidently it was still there on the night of October 21st when the meeting of the stockholders and the meeting of the board of directors were held in the office of Nichols & Hallock. The plaintiff says that on the night of October 21st ''they told me that they would'' pay the money if he ''would bring the certificate up,'' and that checks had already been drawn for Becker and Daniels. The plaintiff says he presented his stock certificate on October 22d and demanded the payment of $9,500, but payment was refused; and then on October 23d he commenced this suit.

Jubitz says that he never promised to pay the plaintiff $9,500. Becker declared that the plaintiff did not at any time during the evening of October 21st mention ''any claim in the sum of $9,500 against the proceeds of the sale of the assets of the Eastern Oregon Hardware Company''; and that the plaintiff did not ''make any demand upon any person there present for the payment of $9,500.'' Hallock testified that the plaintiff said nothing that would indicate he had a claim against the funds, and that the first the witness knew of the plaintiff's claim was shortly after noon of the 22d. This witness stated that he was present during all the discussion and negotiations ''in so far as the firm of Nichols & Hallock was concerned''; and that the plaintiff was not told

that he would receive $9,500 if he would "bring up" his certificate of stock. Schwartz also testified that he did not tell. the plaintiff that he would be paid $9,500 upon the surrender of his stock certificate. The differences between the version given by the plaintiff and that given by the other witnesses are radical and irreconcilable. We think the clear weight of the evidence is against the version given by the plaintiff.

When examining the evidence relating to the plaintiff's contention that his father agreed to pay him $9,500 out of the proceeds of the sale made by Jubitz, we cannot be forgetful of the fact that we have concluded that the weight of the evidence is against the plaintiff in respect of what happened in Cincinnati and in Baker. The evidence does indicate, however, that the father made some sort of a promise to the son on September 12th and probably before that date also. On July 9, 1919, Becker met George W. Kleinschmidt in Portland and talked with the latter about purchasing the hardware store. Kleinschmidt named the sale price. The negotiations were carried on in a room in the Imperial Hotel. Kleinschmidt was hard of hearing. The transom was down. The plaintiff, was in the hall outside the room and heard Becker ask: "What are you going to do with Charlie?" and the father answered, "I will take care of Charlie's stock, Mr. Becker." Becker corroborated the plaintiff. The testimony of these two witnesses indicates that the father intended to "take care of Charlie's stock," although he did not say how he would take care of it.

Jubitz and George W. Kleinschmidt negotiated during the morning of September 12th and the plaintiff was present at least a part of that time.

Jubitz again met George W. Kleinschmidt at 2 P. M. and they then went to the office of Emmons, where at about 3:30 their contract was reduced to writing and signed. Jubitz says that George W. Kleinschmidt did not give him any information about the plaintiff's interest in the corporation during the negotiations at the hotel, and that the only information given by George W. Kleinschmidt about the plaintiff's interest was given directly to Emmons. Again turning to the preamble of the Jubitz contract, it will be observed that the contract recites that George W. Kleinschmidt "is now the owner and holder of 285 shares of said capital stock and is about to purchase and acquire all of the remainder of the stock and thus become sole owner of the entire stock of said corporation." This recital indicates that the father still intended to "take care of Charlie's stock," but that he intended to take care of it by purchasing and thus acquiring it. We think that the evidence shows that the father gave the son a promise of some kind; and, therefore, the important inquiry is: What were the terms and conditions of that promise?

5. If the father and son did no more than to agree that the corporate assets should be reduced to cash and the corporation dissolved, then the law would intervene and require (1) the payment of the corporate indebtedness, including the amount due George W. Kleinschmidt; and (2) the distribution of the balance among the stockholders in proportion to the number of shares held by them. It is conceded that the plaintiff as a stockholder can maintain a suit to compel a distribution of any balance that may remain after payment of the corporate indebtedness. The defendants concede further that since.

the father and the son owned all the stock they could make an agreement like the one which the plaintiff alleges he made with his father, subject of course to the rights of creditors. In other words, it is conceded that it was competent for the two persons who owned all the stock to agree that, as between themselves, the plaintiff was to be paid $9,500 out of the corporate funds before any payment could be made to the father. The defendants further concede that if an agreement was made for the payment of $9,500 out of the corporate assets, the plaintiff can maintain this suit on the theory that a trust was impressed upon a specific fund. The defendants contend, however, that the evidence does not show an agreement to pay the plaintiff out of a specified fund, and that if there was any agreement at all it was at the most only a personal covenant upon the part of the father to pay money to the son for the latter's stock, and that therefore the plaintiff has nothing but a claim against the defendant's estate which must be presented to the executor like any other claim against the estate.

6. The plaintiff relies very largely, and indeed principally, upon what his father is alleged to have said to him on the night of September 12th before his departure for California at 1 A. M. on September 13th. The plaintiff says that he does not know whether his father signed the contract with Jubitz on September 12th, but he is rather of the opinion that his father signed on Monday, September 15th, because of the language employed by his father during the evening of September 12th, and because his father had a "superstitious streak," and the 12th was Friday and Saturday was the 13th and the next day was Sunday. As we view the record,

however, the preponderance of the evidence shows that the writing was signed on the afternoon of September 12th. The testimony of the plaintiff as a witness in his case in chief is recorded on pages 2 to 105, inclusive, of the transcript of testimony. On page 12 he is recorded as having testified that his father said,

"I am going to enter into a 60-day contract with Mr. Jubitz to sell out that business. I am going to get rid of it and I am going to pay you dollar for dollar for your stock, and he says, 'Is that fair?' I says, 'Absolutely.' And he says, 'Then I will go ahead with this contract with Mr. Jubitz'; but he said further, 'Understand, Charlie, if anything should happen to me this ninety-five hundred is to be deducted from your share of the estate.' I says, 'That is perfectly fair,' and he says, "All right.'"

The plaintiff says that later in the evening his wife came into the room where he and his father were and that the latter

"repeated the exact conversation he had with me and asked us both right before him there if that would be satisfactory to us and we told him that it was absolutely all right."

The plaintiff said that he and his father never had any other agreement "excepting the clear-cut agreement guarantee that I was to receive my money." The plaintiff many times speaks of his father's promise as a guarantee to pay him $9,500. Not until we reach page 22 of the transcript of testimony do we find any statement as to where the $9,500 was to come from; and on that page in answer to a direct question the plaintiff stated that it was to come "from the Eastern Oregon Hardware Company business." The plaintiff subsequently testified that when the sale was completed "I was to have the

$9,500," and it was "perfectly and thoroughly understood that this money was to come from the sale of the Eastern Oregon Hardware Company."

In this connection it is of importance to know that the plaintiff himself says that his father

"said nothing whatever about his claims when we discussed or when we agreed that I should have the $9,500 at the completion of the sale of the Eastern Oregon Hardware Company."

The plaintiff further testified:

"After the debts were paid he says I would get my money, the merchandise debts. I knew and clearly understood he didn't consider his account at all, the notes and store account, because he hadn't considered them in any way, shape and form with anyone who put up a proposition to buy the business."

We find, however, upon examination that among the items making up the indebtedness of $26,740.06 is a note for $5,000 to the Baker Loan & Trust Company, obviously not a merchandise debt.

After reading 43 pages of the plaintiff's testimony we find on page 44 the following questions and answers:

"Q. That money [the $9,500] was to be paid from what source you say now?

"A. From the sale of the Eastern Oregon Hardware Company.

"Q. Your father was also to pay the debts of that concern, wasn't he, if there wasn't enough money to pay them and you?

"A. That I knew nothing about absolutely.

"Q. Didn't know anything about that?

"A. I really did not.

"Q. Was there anything said in any conversation with your father about him paying the debts of the corporation?

"A. No, sir, that wasn't a matter of consideration at all between my father and I at the time we agreed.

"Q. Was there anything said in any of those conversations that you had with your father with respect to what your condition would be in the event the sale of this business didn't produce enough money to pay all of the obligations?

"A. Nothing."

The transcript shows (page 45) that the attention of the witness was then directed to the first amended complaint; for we read as follows:

"Q. In the amended complaint which is filed in this cause and in paragraph 8 of this amended complaint which you make in this proceeding you alleged as a part of the contract entered into between yourself and your father that it was understood and agreed between plaintiff and his said father that should there be any deficiency of assets to pay any liability or liabilities of the Eastern Oregon Hardware Company that such and any and all deficiency should be paid at once by plaintiff's said father; is that true, that statement?

"A. That would be true and is true, providing my father did not govern himself properly in agreeing to a contract between he and Mr. Jubitz, but I took it for granted that my father had enough business sense and enough good business judgment not to enter into the contract with Mr. Jubitz and come out at the short end of the horn, as he would term it.

"Q. You had a good deal of admiration for your father's business acumen, did you?

"A. I certainly did.

"Q. Now, just get back to the proposition and tell us whether or not as a part of this so-called contract you had with your father he agreed as you say in your amended complaint there to pay the liabilities of the Eastern Oregon Hardware Company.

"A. Read that again, please.

"Q. (Question repeated.)

"A. That was understood.

"Q. What did he say about that in this conversation that you had with him?

"A. He told me that if,—told me that I would absolutely get this $9,500 and that if there was any deficiency at all it would be up to him to take care of it.

"Q. Deficiency in what?

"A. If the liabilities exceeded the assets.

"Q. Why, you just told Judge Smith a moment ago here that there was nothing said about that at all?

"A. Not at that time, but we had that understanding previous to that time."

The attempted explanation is not satisfactory. The plaintiff's wife gave some testimony which in some particulars tended to corroborate him; but she was in turn contradicted in some respects by one of plaintiff's sisters.

George W. Kleinschmidt told Jubitz about the agreements with Becker and Daniels, and instructed Jubitz to fulfill those agreements; but the father never told Jubitz or any other person about any agreement with the son, and never told any person to pay any moneys to the son. Furthermore, it is a significant fact that the father told Jubitz that "he did not want anybody to lose a cent among the creditors and that he would take what was left over in settlement of his claim."

There are many other details which when considered together argue against the position taken by plaintiff, but we shall not itemize them for the reason that this opinion has already been drawn out to an unusual length.

7. It may be that the father guaranteed to pay $9,500 to the son upon the sale of the hardware store. If such a guarantee was made, the sale of the store

was the contingency upon the happening of which the money was to become due. The plaintiff has failed to show by the kind and quality of evidence required by law that his father agreed to pay $9,500 out of the assets of the corporation or that such payment should be made before payment of the indebtedness due the father; but on the contrary the weight of the evidence indicates that the father did not agree to subordinate the indebtedness due him. At the most, if the father made any agreement at all, he merely assumed a personal obligation to pay his son $9,500; and that such was the nature of the obligation, if any there was, is indicated by what the plaintiff himself says about his father stating that the $9,500 would be treated as an advancement and taken out of the son's share of the estate. We do not decide that the father assumed a personal obligation to pay $9,500 to the son; but we do decide that if such was the character of the obligation, the plaintiff must present his claim to the executor just as ordinary claims must be presented. If there was an agreement of any kind it was devoid of any promise that the $9,500 should be given priority over the amount due the father or that it should be paid out of the proceeds of the sale.

It is not necessary to decide whether the court was without authority to permit the filing of the second amended complaint.

The decree is reversed but without costs to any party in either court.                                      REVERSED.

MR. JUSTICE RAND did not take any part in the consideration or decision of this case.