VAN et al, *Respondents,*

*v.*

FOX et ux, *Appellants.*

(No. 75-2515, SC 24536)

564 P2d 695

Malcolm H. Scott, of Young, Horn, Cass & Scott, Eugene, argued the cause for appellant. With him on the briefs was Edward P. Thompson, Eugene.

William E. Wiswall, Springfield, argued the cause for respondents. With him on the brief were Jill E. Golden, and Lively & Wiswall, Springfield.

HOWELL, J.

## HOWELL, J.

This is a suit for specific performance of an agreement to develop certain real property as a joint venture by the plaintiffs and the defendants. At trial, the defendants contended that plaintiffs had repudiated the agreement and, therefore, were not entitled to specific performance. The trial court rejected defendants' argument and entered a decree granting specific performance. Defendants appeal from that decree. On appeal, however, defendants have abandoned their repudiation argument and now contend that the joint venture agreement should not be specifically enforced on the grounds that its terms are too uncertain, that there is a lack of mutuality of remedy, that plaintiffs no longer have the financial ability to perform their part of the agreement, and that the result would not be inequitable if specific performance were refused.

1. We review de novo. The following is a summary of our review of the transcript and the exhibits.

Plaintiffs Van and Safley are professional real estate developers and co-owners of M & M Development Co. The property involved in this suit came to their attention as a potential Planned Unit Development (P.U.D.) site in 1974. Plaintiff Irving is a real estate agent. Defendants are married, and Mrs. Fox, who has had considerable experience in buying and selling real estate, is employed by a savings and loan association as a licensed real estate appraiser. Mrs. Fox first became interested in participating in the development of this property during a discussion with Safley about another piece of real estate. Safley had discovered that the property in question was held in an estate and was available for purchase. He had already negotiated the basic financial terms of the sale and was in the process of looking for an additional investor. Mrs. Fox expressed her interest in the investment.

The joint venture agreement which eventually resulted was the product of rather extensive negotia-

tions between the parties. It was agreed that the Foxes would provide the initial financing and that plaintiffs would develop the property. The agreement was eventually memorialized in a "letter of intent," the final draft of which was prepared by defendants without the assistance of an attorney. As is frequently the case in such situations, the letter of intent is somewhat imprecise in defining the various rights and duties of each of the parties. However, it is clear from the testimony at trial that the plaintiffs and defendants share a common understanding of their respective obligations under the joint venture agreement.

Essentially, the letter of intent provides that plaintiffs and defendants were to form a joint venture for the purpose of developing approximately eight acres of riverfront property in the city of Eugene as a Planned Unit Development. This development project required both a zone change and approval of the specific P.U.D. plans before the actual development could begin. Under the terms of the agreement, plaintiffs Van and Safley were to secure the necessary zone change and approval of the P.U.D. plans. Defendants, in turn, put up $19,000 (substantially all of the down payment on the property involved), took legal title to the land, and agreed to make the necessary payments on the property until final approval of the P.U.D. plans. Plaintiff Irving contributed the remainder of the down payment by waiving his commission on the sale. The original purchase price of the property was approximately $83,000.

The letter of intent also provided that upon final approval of the P.U.D. plans by the City of Eugene, plaintiffs were to purchase defendants' interest in the property in accordance with a formula set out in the agreement. However, the defendants reserved an option to reinvest the proceeds of this sale in the further development and construction of the P.U.D. Defendants also reserved an option to retain a portion of the property for their own residence, which was to be built

in accordance with the approved P.U.D. development plans.

The letter of intent was signed on July 26, 1974. At that time plaintiffs had already begun taking the necessary steps toward obtaining the zone change and eventual P.U.D. approval. Architects and engineers were employed, alternative designs were explored, preliminary plans were drawn up, consultations were had with the planning commission staff, and public hearings were held before both the planning commission and the city council. Plaintiffs also purchased two small adjacent parcels for $22,000 and added them to the project at the request of the planning commission. By December, a zone change had been granted, conditioned upon final approval of the P.U.D., and the initial stage of the approval process, pre-preliminary approval, had been successfully accomplished. As a result, the market value of the property had been greatly enhanced.

Plaintiffs were preparing for the next P.U.D. approval stage when they received an inquiry from a development group in California concerning a purchase of the property. Plaintiffs then consulted the defendants who gave permission to negotiate with the California developers. Eventually, an earnest money receipt was signed on an offer of $160,000, and plaintiffs presented this offer to defendants.

Plaintiffs felt that this offer was extremely favorable to all concerned and represented the maximum profit which could reasonably be expected from the development of the joint venture property. However, the evidence also indicates that the offer was particularly attractive to plaintiffs because at the time they were experiencing a severe cash flow problem due to losses on other development projects. Defendants were aware of plaintiffs' financial problems, and their response to the California offer was lukewarm at best. There was testimony which indicated that defendants

had already begun to consider finding another developer for "their" property.

The relationship between plaintiffs and defendants became increasingly strained during discussions of the merits of the California offer. Eventually communications broke down completely when defendants took the position that plaintiffs had no legal interest in the property, and defendants, therefore, did not have to agree to anything. At this point, both sides hired attorneys.[1] Letters were exchanged, but the positions of the parties only became more polarized. Ultimately, defendants, through a letter from their attorney, ordered plaintiffs off the property:

> "* * * [I]nasmuch as your clients have abandoned whatever agreement may have existed between them and Mr. & Mrs. Fox, they are no longer authorized to come upon the premises which are the subject matter of the sale offer for any purpose whatsoever."

This action by the defendants effectively prevented plaintiffs from conducting any further efforts to obtain P.U.D. approval. After one more letter in which he attempted to dissuade defendants from that course of action, plaintiffs' attorney filed this suit for specific performance of the joint venture agreement.

On appeal from the trial court's decree granting specific performance, defendants contend that the joint venture agreement should not be specifically enforced because it is too indefinite and there would be no mutuality of remedy. They also contend that plaintiffs are financially unable to perform and that it would not be inequitable to refuse to enforce the joint venture agreement and allow defendants to retain the property. We will treat each argument separately.

Preliminarily, we must deal with plaintiffs' contention that defendants should not be allowed on appeal to raise arguments which were not raised at the trial

---

[1] Neither defendants' present attorney nor plaintiffs' present attorney were involved in this case at the time of these negotiations.

level because, as defendants candidly admit, the issues at trial were largely confined to defendants' theory that plaintiffs' negotiations with the California developers constituted a prior abandonment of the joint venture agreement.

 When defendants breached their agreement by refusing to allow plaintiffs to come upon the property—thereby preventing them from continuing with the P.U.D. approval process—plaintiffs had the option of either suing for damages or seeking specific performance. While defendants are not allowed to raise an entirely new defense on appeal, plaintiffs still have the burden of showing they are entitled to specific performance of their agreement with defendants. This necessarily involves a contract capable of being specifically enforced. *Compare Friesen v. Fuiten,* 257 Or 221, 478 P2d 372 (1970); *Woods v. Hart,* 254 Or 434, 458 P2d 945 (1969); *Drury et ux v. Pekar et al,* 224 Or 37, 355 P2d 598 (1960).

It is, of course, a well-established rule that:

> "In a suit for specific performance, the contract itself must be specific enough to serve as the foundation of a specific decree. The court cannot be wiser than the parties themselves or go more into detail than they have marked out for their conduct, or make a new contract for them." *Feenaughty v. Beall,* 91 Or 654, 667, 178 P 600 (1919).

*See also* J. Pomeroy, Specific Performance of Contracts 402-03, § 159 (3d ed 1926). However, this rule must not be applied too rigidly, for as we noted in *Howard v. Thomas,* 270 Or 6, 10, 526 P2d 552 (1974), in suits for specific performance, as in other cases:

> "The law does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." (*Quoting* 11 Williston on Contracts 813, § 1424 (3d ed 1968).)

*Accord* 5A Corbin on Contracts 279-83, § 1174 (1964):

> "Courts should be ready to give those reasonable

interpretations that ordinary businessmen are willing to give, seeking the aid of experts and giving heed to all the surrounding circumstances. * * * The fact that the parties omitted certain provisions that are commonly included may indicate an intention to be bound without them and the gaps may be provided for in the decree.

"* * * * *.

"* * * Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact."

*See also* Restatement of Contracts § 370 (1932).

■ Essentially, then, the resulting standard becomes one of substantial fairness to both parties. Neither party to a contract should be required to perform additional, material terms to which he did not either explicitly or implicitly agree. On the other hand, however, neither party should be allowed to avoid his contractual duties merely because the language which was utilized to express the agreement is less specific and complete than that which a careful lawyer would ordinarily employ.

Although the letter of intent which was drafted by defendants in an attempt to memorialize this joint venture agreement appears to be rather imprecise in some respects,[2] it is clear from the testimony at trial

---

[2]Defendants contend that the following three portions of the letter of intent are too indefinite:

(First) "1(b) DEVELOPER [Plaintiffs] agrees to purchase said property upon completion of necessary zoning and P.U.D. procedure for a gross sale price or calculated by the formula contained herein.

"* * * * *.

"3. At such time as a final zoning action and completion of P.U.D. plans is accepted by the City of Eugene, the parties agree to enter into a contract, the terms of which will include but will not be limited to the following * * *."

(Second) "1(c) It is further agreed that at FOX'S [Defendants] option under terms mutually acceptable, FOX may reinvest their equity position at time of sale into the further development of real property improvements and the investment benefits derived therefrom. * * *."

(Third) "4. DEVELOPER [Plaintiffs] agrees that FOX [Defendants]

that both plaintiffs and defendants share a common understanding as to the essential terms of their agreement. The testimony indicates that the parties have always agreed that the purchase price that plaintiffs are to pay defendants upon the completion of the P.U.D. process is to be computed as follows: The gross selling price is to be computed by multiplying the number of units finally approved by $1,500. According to current projections, this will yield a gross selling price of approximately $160,000. From that amount, the capital contributions and other expenses of all the parties will be deducted. The resulting figure will be treated as the net profit and will be divided among the parties with 45 per cent going to the Foxes, 45 per cent to Safley and Van, and 10 per cent to Irving, and the property deeded over to plaintiffs. The Foxes then have the option of reinvesting the proceeds of this sale into the further development and construction of the P.U.D. They also have the option of retaining a portion of the property for their own use so long as it conforms with the P.U.D. specifications as finally approved.[3]

may have the option to retain a portion of the property of their choice for the purpose of building their own dwelling thereon. Exterior of said residence shall be so designed to be in harmony with design accepted by the City Planning Authorities for the total P.U.D. development."

[3] Defendants' own testimony shows that there was no dispute as to the essential terms of the agreement:

"Q. Was it your understanding that the basis of the cash price that you would be paid would be on the basis of the fifteen hundred dollars per unit?

"A. [Mrs. Fox] Yes.

"Q. All right. Was it your understanding that this would mean that you would multiply fifteen hundred times thirteen—well, multiply 13.2 units times eight acres?

"A. 8.11, I believe.

"Q. Okay. And then you multiply that figure by fifteen hundred?

"A. Uh-huh.

"Q. All right. That would give you a total price of close to around a hundred sixty thousand, wouldn't it?

"A. Uh-huh.

"Q. And then from the hundred sixty thousand you'd be entitled to receive back what you had expended on the premises for purchase of the property?

Both sides agree that these are the terms of the joint venture agreement which defendants attempted to memorialize in the letter of intent, as the following testimony clearly indicates:

[Defendant Elizabeth Fox]:

"Q. Okay. And you—Of your own knowledge, Mr. Safley's and Mr. Van's interpretation of the agreement is the same, isn't it?

"A. So far as I know.

"Q. All right. There has never been any real dispute over that, has there?

"A. No."

"A. Yes.

"Q. And the plaintiffs would be entitled to receive back what they had expended for professional teams and other expenses?

"A. Yes.

"Q. All right. And the mortgages and land sale contracts would be paid off on the premises?

"A. Yes.

"Q. And then the rest would be profit?

"A. Yes.

"Q. All right. And then you'd be entitled to forty-five percent of the profit?

"A. Yes.

"Q. And Mr. Van and Mr. Safley would be entitled to forty-five percent?

"A. Yes.

"Q. And Mr. Irving, ten percent?

"A. Yes.

"Q. All right. Now, what was your understanding after you were paid this sum by Mr. Van and Mr. Safley? What was your understanding as to what your position would be then?

"A. My understanding was that we would have a piece of property free and clear for the house and that would be in accordance with the planned unit development, over-all structure—plan. And that if we so chose, we could put our equity back into the full project.

"Q. Yes. And your equity then would be the amount that you had received in the amount of forty-five percent of the profit?

"A. Right.

"Q. Okay. And you—Of your own knowledge, Mr. Safley's and Mr. Van's interpretation of the agreement is the same, isn't it?

"A. As far as I know.

"Q. All right. There has never been any real dispute over that, has there?

"A. No."

[Plaintiff Michael Safley]:

"Q. All right. And did you—You heard Mrs. Fox testify, did you?

"A. Yes, sir.

"Q. All right. And is her interpretation of the contract the same as yours?

"A. Yes, sir."

This alone would seem to be sufficient to cure the alleged defects in the writing, for apparently there is no doubt as to the intention of any of the parties concerning the material elements of their agreement. *See Howard v. Thomas, supra,* 270 Or at 10 and n. 3 (*quoting* Friedman, Contracts and Conveyances of Real Property 27, 34, § 1.3 (2d ed 1963)) and 270 Or at 12 (*quoting* 6 Powell on Real Property 330, § 927 (1969)). Moreover, it should be kept in mind that the document which defendants now claim to be too indefinite to be enforceable was drafted by defendants themselves, and, consequently, to the extent of any remaining ambiguity, it must be construed most strongly against them.

 We believe that the letter of intent was sufficiently definite, certain and complete to make the joint venture agreement specifically enforceable. Although certain additional terms of this agreement remain to be negotiated upon completion of the first stage of the joint venture, *i.e.,* the successful completion of the P.U.D. approval process, the essential features of the agreement have been previously determined. Moreover, the law will recognize a requirement that these further negotiations must be conducted in good faith by both parties. *See, e.g., Morris v. Ballard,* 16 F2d 175, 49 ALR 1461 (DC Cir 1926); *Taylor et ux v. Wells et ux,* 188 Or 648, 657-58, 217 P2d 236 (1950). This is particularly true in this case because these parties are engaged in a joint venture and, therefore, they will be held to an even higher standard of conduct toward each other than that which would otherwise be applied. *Cf. Delaney v. Georgia Pacific,* 278 Or 305, 564 P2d 277 (1977); *Fouchek et al v. Janicek,* 190 Or

251, 225 P2d 783 (1950); *McIver v. Norman,* 187 Or 516, 205 P2d 137, 213 P2d 144, 13 ALR2d 749 (1949).

It is not unusual for parties involved in complicated business transactions to allow subsidiary details to remain unspecified until such time as the need for agreement actually arises. Indeed, it would be impossible to foresee in advance and presently agree upon all the details of a project as far-reaching as the development and construction of a P.U.D. Therefore, we do not believe that the fact that some terms pertaining to the future performance of this joint venture contract remain unspecified at this time is alone sufficient to prevent the specific enforcement of the agreement. We are no more ready to assume that the parties will breach their obligation to negotiate in good faith than we are to assume that they will breach any other contractual obligation. *See Ammerman v. City Stores Co.,* 266 F Supp 766 (D DC 1967), *aff'd* 394 F2d 950, 38 ALR3d 1042 (DC Cir 1968); *Morris v. Ballard, supra.*[4] *See also Kleinschmidt v. Central Trust Co. et al,* 103 Or 124, 146, 203 P 598 (1922).

Finally, plaintiffs have already expended considerable time and money in performing their obligations under the joint venture agreement. These efforts have inured to the benefit of defendants by enhancing the value of the property of which they are now the legal owners. At this stage, defendants can hardly expect an equity court to be too favorably disposed toward the argument that the instrument which they themselves drafted should not be specifically enforced—in order to allow plaintiffs to continue with their own performance—solely because it is somewhat incomplete and indefinite. *See* J. Pomeroy, Specific Performance of Contracts 378-79, § 145 (3d ed 1926):

---

[4] We recognize that this conclusion may be in conflict with dicta in *Smith v. Vehrs,* 194 Or 492, 500, 242 P2d 586 (1952). However, that dicta was specifically rejected as too "restrictive" in *Howard v. Thomas,* 270 Or 6, 10, 526 P2d 552 (1974).

"* * * [W]hen a *contract has been partly performed* by the plaintiff, and the defendant has received and enjoys the benefits thereof, and the plaintiff would be virtually remediless unless the contract were enforced, the court, from the plainest considerations of equity and common justice, does not regard with favor any objections raised by the defendant merely on the ground of the incompleteness or uncertainty of the agreement. Even if the agreement be incomplete, the court will then, in furtherance of justice and to prevent a most inequitable result, decree a performance of its terms as far as possible, although, perhaps, with compensation or allowance. In fact * * * one ground of the equitable jurisdiction to decree a specific performance is the incompleteness of the contract, which would prevent an action at law, but which exists to such a limited extent and under such circumstances that a refusal to grant any relief would be plainly inequitable." (Emphasis in original; footnotes omitted.)

*See also* 5A Corbin, *supra* § 1174 at 287; 11 Williston, *supra* § 1424 at 819 and n. 15:

"[I]t seems probable that the difficulty regarding uncertainty has been overemphasized; certainly, it should not be allowed to hamper or restrict equitable relief further than necessity requires. * * *

"The decisions reveal a trend toward greater liberality in enforcement * * *."

■ For similar reasons, we also hold that the doctrine of mutuality of remedy does not bar a decree of specific performance. In *Paullus v. Yarbrough et ux,* 219 Or 611, 347 P2d 620, 79 ALR2d 1222 (1960), we stated that the "most workable" doctrine of mutuality was that set forth in 5 Williston on Contracts 4022-023, § 1440 (rev. ed 1937) (now 11 Williston on Contracts 936-37, § 1440 (3d ed 1968)), and we quoted from that authority as follows:

" ' * * * Where the contract is executory on both sides, the court may still give specific performance if it is satisfied that the person seeking relief will continue to perform. This may be shown by past conduct; or the person seeking specific performance may have such a strong economic interest in the carrying out of the

contract by reason of extensive investment of his funds and labor that default on his part is highly improbable.' " 219 Or at 644.

We feel that there was sufficient evidence in this case to afford reasonable assurance that plaintiffs will continue with the P.U.D. approval process and with the further performance of the joint venture agreement. Both the past conduct of plaintiffs under the agreement and their testimony at trial indicate that they stand ready, willing and able to continue with the joint venture. It is also clear that plaintiffs' only hope to profit by this venture and to recoup their past efforts and expenses lies in their continued performance of the contract. It must be remembered that the defendants in this case, not the plaintiffs, prevented further performance of plaintiffs' obligations by refusing to allow them to come onto the property and thereby precipitated this suit.

Defendants also contend that plaintiffs' present financial difficulties may prevent them from obtaining sufficient financing to enable them to purchase the property from defendants and to proceed with further development and construction once the P.U.D. approval process is completed. However, the time for performance of these obligations has not yet arrived, and plaintiffs' testimony indicates that they will have sufficient personal assets and adequate borrowing power to finance their future obligations. It should also be noted that at this time plaintiffs are asking only that they be allowed to continue with their own efforts in performing the contract. This will not place any undue hardship on defendants, for if plaintiffs are eventually financially unable to complete their remaining obligations, the defendants will enjoy the benefits of plaintiffs' efforts during the interim.[5]

---

[5]Under the terms of the letter of intent, plaintiffs originally had two years to successfully complete the P.U.D. approval process. Because of defendants' breach in evicting plaintiffs from the property, plaintiffs were unable to continue their efforts and the two-year period has expired. Under such circumstances, plaintiffs must now be allowed a "reasonable time" in which to obtain P.U.D. approval. *See, e.g., Michel v. ICN Pharmaceuticals,* 274 Or 795, 809, 549 P2d 519 (1976).

Finally, we reject defendants' argument that it would not be inequitable to refuse specific performance. As we have previously noted, plaintiffs have already expended considerable amounts of time and money toward securing a zone change and obtaining the necessary P.U.D. approval, including the purchase of two adjacent properties at the request of the planning commission. Most of the substantial appreciation in value of the joint property is directly attributable to plaintiffs' efforts. To deny them the fruits of their labors by refusing to enforce the joint venture agreement would not only be unfair to plaintiffs but would also provide the defendants, who have breached this contract, with an unjust windfall. Mrs. Fox herself admitted at trial that if the contract were not enforced she would "stand to profit considerably" and that if she and her husband were then able to sell the property to someone else for development as a P.U.D., their profit would be "at least twice the amount" that they would receive under the joint venture agreement.

In summary, we hold that the trial court properly entered a decree of specific performance in this case.

Affirmed.