**J.G.N. CORP., an Oregon corporation, Plaintiff,**

v.

**NATIONAL AMERICAN INSURANCE COMPANY, a Nebraska corporation, National American Insurance Company of California, a California corporation, and National American Insurance Company of New York, New York corporation, Defendants.**

**Civ. No. 86–649–PA.**

United States District Court, D. Oregon.

Sept. 7, 1988.

On Motion to Clarify Dec. 15, 1988.

Michael C. McClinton and James C. Edmonds, Clark, Lindauer, McClinton, Todd, Krueger & Fetherston, Salem, Or., for plaintiff.

Barnes H. Ellis, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for Nat. American Ins. Companies.

## OPINION

PANNER, Chief Judge.

Plaintiff J.G.N. Corp. brings this action against defendants National American Insurance Co., National American Insurance Co. of California, and National American Insurance Co. of New York. Plaintiff alleges breach of contract and, in interpleader, requests that funds deposited into court be awarded as damages. In the pretrial order, plaintiff sought to amend the complaint to add a claim for fraud. At the pretrial conference, plaintiff withdrew its motion to amend.

On April 5 and 6, 1988, a court trial was held. At the trial, the parties agreed that I would determine the issue of liability and reserve ruling on the amount of damages. The parties filed post-trial briefs. I find in favor of plaintiff on the breach of contract claim.

## BACKGROUND

Plaintiff J.G.N. Corp. is a managing general agent for various insurance companies. Bo Newman is president of J.G.N. Corp. Defendants are insurance companies. The parties executed their first agency agreement in 1970 and a second agreement in 1975.

In July 1984, the parties executed a General Agency Contract and Profit Sharing Agreement that was modified in March 1985 (1984 Agreement). The 1984 Agreement provided:

> The Company [defendants] shall prepare Profit Sharing participation statements within three (3) months after the close of each calendar year and forward to the General Agent for examination, and the amount of the Profit Sharing participation due General Agent shall be promptly paid after confirmation....
>
> The first Profit Sharing year shall end December 31, 1984. The Profit Sharing shall be calculated annually on a calendar year basis. Payment shall be made on or before April 1, of the succeeding year....
>
> In the event notice of termination and cancellation of this agreement is given by either party, no Profit Sharing participation statement shall be rendered until after the expiration or termination of liability of all policies and the settlement of all losses thereunder or coming under this agreement.

Exh. 5.

In August 1985, defendants announced their immediate withdrawal from the insurance business and rescinded plaintiff's authority to write defendants' policies. Plaintiff had difficulty finding other insurance carriers to replace some of its lost business. Plaintiff considered defendants' immediate mass termination a breach of the 1984 Agreement and threatened to sue. In response, defendants allowed plaintiff limited authority to continue some business for 90 days.

In October, when it became apparent to plaintiff that defendants were committed to a complete termination, plaintiff made additional requests, including the acceleration of its 1985 profit share. Under the 1984 Agreement, plaintiff's profit share for a termination year was not due until all claims were settled. Under those terms, payment would not be due for a very long time, if ever. On October 14, 1985, Newman, Ronald Bailey, plaintiff's attorney, Robert Barbarowicz, an attorney for defen-

dants, and Mike Johnson, a representative of defendants, talked by telephone. Bailey listed four conditions for an amicable termination. One condition was to pay the profit share for 1985 in April 1986 as though it was not a termination year.

On November 7, 1985, Johnson and Dale Ogden, representing defendants, and Newman, representing plaintiff, met in Portland to discuss the termination. The meeting was friendly and lasted approximately one hour. At the end of the meeting, after all other problems were resolved, Newman brought up the profit share issue. Ogden suggested adding a provision for "IBNR" (Incurred But Not Yet Reported losses). Using IBNR, defendants would estimate and create a reserve for losses which have occurred in one year, but are not yet reported until the following year. Newman rejected the inclusion of IBNR because he did not want to use estimates or actuarial tables. Ogden then suggested that defendants would be willing to pay the profit share in two parts, half in 1986 and half in 1987. Newman rejected that proposal and suggested that the profit share be paid in April 1986 and plaintiff would waive all future earned premiums. Newman testified that Ogden said, "It's a deal." Ogden testified that he suggested allowing a three month "run off." A run off period would allow defendants to account for 1985 losses that were actually reported within the first three months of 1986, without using estimates.

In December 1985, the parties executed a Settlement Agreement and Release (Settlement Agreement). The Settlement Agreement provided:

> Notwithstanding the termination of the General Agency Agreement ..., the profit sharing participation due [plaintiff] for calendar year 1985 shall be calculated at April 1, 1986 on all business transacted in 1985, and [defendants] agree to pay such profit sharing participation to [plaintiff] within 10 days of April 1, 1986.

Exh. 41. The agreement was drafted by defendants. Plaintiff added the words, "on all business transacted in 1985."

In late December 1985, defendants shut down to consolidate their operations before the new year. Losses reported the last ten days of 1985 were not entered into defendants' computer system until 1986. Defendants did not complete processing their backlog of claims until March 1986.

## STANDARD

■ A court should avoid destruction of a contract because of uncertainty and, where possible, should construe agreements to effectuate the reasonable intentions of the parties. *Van v. Fox*, 278 Or. 439, 445, 564 P.2d 695 (1977). Neither party should be required to perform additional, material terms to which it did not explicitly or implicitly agree. However, neither party should be allowed to avoid contractual duties because the language of the agreement is less specific and complete than a careful lawyer would ordinarily apply. *Id.* at 446, 564 P.2d 695.

Extrinsic evidence is generally inadmissible when the terms of an agreement have been reduced to writing. ORS 41.740. Evidence may be admitted to show the circumstances under which the contract was made or to explain an ambiguity in the contract. ORS 41.740; *Deerfield Commodities Ltd. v. Nerco, Inc.*, 72 Or.App. 305, 317, 696 P.2d 1096, *review denied*, 299 Or. 314, 702 P.2d 1111 (1985).

■ A contract is not ambiguous merely because the parties disagree on its interpretation. *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir.1986) (applying Oregon law). Ambiguity arises where the words of a contract are reasonably susceptible to more than one meaning. *Western Fire Ins. Co. v. Wallis*, 289 Or. 303, 308, 613 P.2d 36 (1980). However, the court should not attribute possible but unlikely meanings to the terms of a contract. *Id.*

## DISCUSSION

■ Plaintiff contends that under the Settlement Agreement, its profit share should be based on the income and incurred losses reported in 1985. Plaintiff contends that according to its calculations its profit share for 1985 is $937,467.

Defendants contend that the parties intended the profit share to be based on income reported during 1985 and incurred losses reported from January 1, 1985 through March 31, 1986. If the losses reported in the first three months of 1986 are included, plaintiff's profit share is zero. Defendants contend that if the parties did not agree to the 1986 run off period, then there was no meeting of the minds on the profit share provision of the Settlement Agreement, and the profit share determination should be governed by the provisions of the 1984 Agreement. Under the 1984 Agreement, plaintiff's profit share would not be due until the last claim was settled. Under the 1984 Agreement, plaintiff's profit share probably would be zero.

Within the insurance industry, the term calendar year refers to a twelve-month period. The 1985 calendar year would be January 1, 1985 through December 31, 1985. When "1985 calendar year" is replaced with its definition, the profit sharing clause of the Settlement Agreement provides:

> The profit sharing participation due [plaintiff] for January 1 through December 31, 1985, shall be calculated at April 1, 1986, on all business transacted in 1985, and [defendants] agree to pay such profit sharing participation to [plaintiff] within 10 days of April 1, 1986.

Defendants contend that "at" is synonymous with "as of." Defendants also contend that "on all business transacted in 1985" includes income and losses occurring in 1985, regardless of when they become known. When these definitions are added, the profit sharing clause provides:

> The profit sharing participation due [plaintiff] for January 1 through December 31, 1985 shall be calculated as of April 1, 1986 on all income and losses that occurred in 1985, and [defendants] agree to pay such profit sharing participation to [plaintiff] within 10 days of April 1, 1986.

Defendants contend that under their interpretation, the losses that occurred in

1985 but reported within the first three months of 1986 would be included within the profit sharing calculation. It is unlikely that defendants' interpretation was the intended meaning of the provision.

Plaintiff added the phrase "on all business transacted in 1985." That phrase does not expand the period for losses attributable to the profit share calculation. Rather, that phrase emphasizes the twelve-month limitation of the 1985 calendar year. Defendants contend that "at April 1, 1986" allows defendants to include all losses known on that date. Defendants place too much meaning on such a little word. The word "at" designates when defendants must calculate the profit share. It does not extend the twelve-month period for losses attributable to the profit share calculation.

Defendants contend that although they were willing to compromise on the profit share issue, plaintiff's interpretation represents a complete concession. Defendants knew prior to the November 7 meeting that plaintiff wanted its profit share calculated under the 1984 Agreement as though it were a nontermination year. The negotiations on November 7 were amicable. Defendants, experts in the insurance business, with the advice of counsel, drafted the Settlement Agreement. With minor modification, that draft became the final Settlement Agreement. Defendants failed to incorporate any alleged compromise. Rather, the profit share provision of the Settlement Agreement as written is consistent with the terms of the 1984 Agreement and plaintiff's interpretation of the clause.

Defendants contend that closing down their computers in December and entering backlogged claims in March 1986 were acts consistent with their interpretation of the Settlement Agreement. However, Ogden testified that defendants shut down their computers in December to consolidate operations, and would have done so regardless of the terms of the profit share provision.

Defendants also did not show that they were capable of clearing the backlog of claims prior to December 31, 1985.

In addition, Steven Balodimas, former regional vice-president of field sales for defendants, testified that in February 1986, Ogden instructed Richard Rollins to calculate plaintiff's profit share based on year end results. Rollins, the senior vice president of operations for defendants, testified that after reading the 1984 Agreement and the Settlement Agreement and consulting with Don Rapp, another vice president, he calculated plaintiff's profit share based on calendar year figures. Those figures did not include losses incurred in 1985 but reported in the first three months of 1986.

In February 1986, Newman called Ogden at his office in New York. Newman asked about the profit share calculation. Ogden told him that Rollins had made the calculation. Ogden stated that although they would not have the final figures until the end of March, based on the figures he had seen, the profit share would be a very large amount, around $800,000. Ogden never told Newman that he anticipated significant deductions from that figure, or that he believed Rollins' calculation was inaccurate because it did not include the 1986 runoff.

I conclude that the contract is unambiguous. Plaintiff's profit share was to be calculated April 1, 1986 on the income and losses reported in the 1985 calendar year. That figure does not include 1985 losses that were reported in the first three months of 1986.

## CONCLUSION

This opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

I find in favor of plaintiff on the breach of contract claim. A status conference will be held Monday, September 12, 1988 at 1:30 p.m. to discuss further proceedings.

## ON MOTION TO CLARIFY

On September 7, 1988, I issued an opinion finding defendants had breached their contract with plaintiff. At a status conference held on September 26, 1988, defendants asked me to clarify the meaning of the word "reported" as used in the opinion,

and to clarify whether certain reserve adjustments made after 1985 should be deducted from plaintiff's profit share. I conclude that "reported" does not include losses entered on defendants' books after the end of the 1985 calendar year, and that reserve adjustments made after the close of the 1985 calendar year cannot be used in calculating plaintiff's profit share.

## BACKGROUND

Plaintiff J.G.N. Corp. is a managing general agent for various insurance companies. Defendants are insurance companies. These parties executed a General Agency Contract and Profit Sharing Agreement that was modified in March 1985 (Agreement). My September 1988 opinion cites pertinent sections of the Agreement and a settlement agreement between the parties, and discusses the negotiations and litigation following termination of the Agreement in 1985.

While repetition of the details of the initial Agreement, the settlement agreement, and subsequent litigation is unnecessary, the following facts are important:

—According to the parties' settlement agreement, plaintiff's profit share for 1985 was to be "calculated at April 1, 1986 on all business transacted in 1985...."

—The Agreement provides a formula to calculate plaintiff's profit share. According to this formula, losses incurred include "losses outstanding at the end of the current period including loss reserves and paid and reserved adjustment...." One of the components of "outgo" specified in the Agreement is "reserves for losses and loss adjustment and legal expense outstanding at the close of the current calendar year."

—In my September 1988 opinion I concluded that plaintiff's profit share was to be calculated on the income and losses reported in the 1985 calendar year.

—Defendants had shut down their computers during consolidation of their operations in late 1985, and did not enter losses reported during the last ten days of 1985 until 1986.

Defendants now contend that "reported" as used in my opinion includes losses that the parties became aware of in 1985 even if these were not entered into defendants' records until 1986. Defendants also argue that they should be allowed to deduct certain reserve adjustments made after the close of the 1985 calendar year from plaintiff's profit share.

## DISCUSSION

### 1. "Reported"

Defendants' trial exhibits showed "incurred losses" for 1985 totalling $1,016,125 and $665,046 owing to plaintiff. These figures include only losses which were entered into defendants' records before the defendants' computer was shut down for the year on December 22, 1985. At trial, Mr. Ogden, defendants' witness, testified that if profit sharing calculations were based on a calendar year ending with losses reported by December 31, 1985, these figures reflected the amount defendants owed plaintiff. I am unwilling to now construe reported losses in a manner inconsistent with defendants' trial exhibits and testimony.

### 2. "Reserve Adjustments"

Defendants' argument that reserve adjustments made after the end of 1985 should be deducted from plaintiff's profit share is also unpersuasive. Defendants' calculation of incurred losses as totalling $1,016,125, noted above, does not include reserve changes made after the close of the 1985 calendar year. Mr. Ogden stated in a deposition that "the calendar year looks at paid losses and the changes and reserve during a particular twelve-month period." Allowing defendants to deduct reserve adjustments made after the close of the 1985 calendar year would be inconsistent with defendants' own calculations presented at trial, with the method of calculation provided by the Agreement, and with my ruling that plaintiff's profit share is to be calculated on a calendar year basis.

## CONCLUSION

"Reported" shall be construed as excluding losses entered on defendants' books after the end of the 1985 calendar year. Reserve adjustments made after the end of 1985 shall not be considered in calculating plaintiff's profit share.

IT IS SO ORDERED.