Argued and submitted April 9, affirmed August 15, 2001

Randal W. HOLDNER,
*Appellant,*

*v.*

William F. HOLDNER
and Patricia Holdner,
*Respondents.*

Patricia HOLDNER,
*Counterclaim-Plaintiff,*

*v.*

Randal W. HOLDNER,
*Counterclaim-Defendant.*

97-2188; A104337

29 P3d 1199

David B. Markowitz argued the cause for appellant. With him on the briefs were Lynn R. Stafford and Markowitz, Herbold, Glade & Mehlhaf, P.C.

Thomas A. Bittner argued the cause for respondent Patricia Holdner. With him on the brief was Schulte, Anderson, Downes, Aronson & Bittner, P.C.

No appearance by respondent William Holdner.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

## BREWER, J.

Plaintiff Randal Holdner appeals from a judgment in favor of defendants William and Patricia Holdner.[1] Randal is the son of William and Patricia. Shortly before the trial of his parents' marital dissolution action, Randal brought this action against both of them, seeking a judicial declaration recognizing and enforcing an oral contract between himself and his parents. Randal alleged that he agreed to work for the family's cattle ranching business (Holdner Farms) in exchange for a one-half ownership interest in the business—including real property—during his parents' life and complete ownership upon William's death, subject only to Patricia's life estate in the family residence property. Randal requested that the court "immediately enforce defendants' promise to pass the farm to plaintiff because of Patricia Holdner's anticipatory repudiation of the agreement." According to Randal, Patricia repudiated the agreement by asserting in the dissolution action that the business and associated real property constituted marital assets in which she was entitled to share.[2] After a bench trial, the court entered judgment against Randal and in favor of Patricia and William. On appeal, Randal argues that the trial court erred by not declaring valid and enforcing the alleged contract against both defendants or, at least, between Randal and William. We affirm.

The parties disagree as to the applicable standard of review. Randal contends that, because this is an equity action, we review *de novo*. ORS 19.415(3); *see also McWhirter v. McWhirter*, 54 Or App 409, 413, 635 P2d 12, *rev den* 292 Or

---

[1] For clarity, we refer to the individual family members by their first names. William appeared *pro se* before the trial court and did not enter an appearance before this court.

[2] Randal's complaint sought (1) a judgment declaring Randal to be the rightful and sole owner of the partnership property subject to William's and Patricia's life estate in one portion of the property and to their share during their lifetimes in the profits and losses of the partnership, and (2) specific performance of the agreement with William and Patricia or a mandatory injunction requiring them to convey title to Randal of all partnership property, subject to William's and Patricia's life estate in the one portion and to their share during their lifetimes in the profits and losses of the partnership.

334 (1981) (on *de novo* review, appellate court defers to factual findings of the trial court regarding only disputes of material fact that turn on the credibility of witnesses). Patricia responds that declaratory actions to construe a contract are legal in nature, and the findings of the trier of fact are binding on appeal if there is evidence in the record to support them. *See L & E Farms v. Leonard*, 170 Or App 528, 533-34, 13 P3d 527 (2000); *Wadsworth v. WWDM, Ltd.*, 162 Or App 622, 628 n 4, 986 P2d 1197 (1999), *rev den* 330 Or 71 (2000). Because, as explained below, the trial court's decision is supported by a preponderance of the credible evidence, the resolution of this case does not turn on the standard of review. Therefore, we need not decide which of the parties' positions is correct.

The following facts were undisputed at trial, except where conflicts are noted. At the time of trial, William and Patricia had been married 45 years. During the marriage, William worked primarily as a partner in a small accounting firm. Patricia was a homemaker. In 1968, William purchased a house located on a four-acre parcel of land near Scappoose, known to the family as "the home place." Although it was the family residence, only William's name was shown on the title to the home place. Over the course of the next several years, William purchased two other larger parcels of land, the "Chapman" property—approximately 17 acres—and the "Dutch Canyon" farm—approximately 100 acres. As before, the titles to those properties were held only in William's name. Over time, William and Patricia purchased cattle as gifts to their children, Laurie and Randal. The children began showing the cattle at 4-H and FFA livestock shows. Eventually, the children's hobby grew into an enterprise known as Holdner Farms. In about 1975, Laurie decided to attend college and no longer wished to participate in the family business. She gave her cattle to Randal.

In 1977, Randal chose to forgo attending college and instead remained at home to help on the farm. Randal testified that he had worked on the farm since 1977 pursuant to an oral agreement that he made with both of his parents. According to Randal, William and Patricia agreed in 1977 that he would receive a 50 percent ownership interest in Holdner Farms, including all three parcels of real property,

with William retaining ownership of the remaining 50 percent. William's 50 percent interest was to pass to Randal on William's death.

Since 1977, William and Randal both have contributed to the operation of Holdner Farms. They have jointly purchased three more parcels of property—the 185-acre "Sattler" property in 1984, the 204-acre "Johnson's Landing" property in 1989, and the 7.5-acre "Hays" property in 1992—bringing the total area of the enterprise to more than 500 acres. The three parcels purchased after 1977 are owned by William and Randal as tenants in common. The land sale contract for the Sattler property and the deed for the Hays property are silent with regard to the form of co-ownership between them. The deed to the Johnson's Landing property expressly conveyed that parcel to William and Randal as tenants in common.

From the outset, William has handled most of the accounting and business affairs for Holdner Farms, and he also has provided some labor on evenings and weekends. Randal works long hours doing various jobs associated with running the physical operations of Holdner Farms. By all accounts, Patricia has had very little to do with the day-to-day operation of Holdner Farms.

In 1996, Patricia filed a marital dissolution action against William. Initially, she asserted no claim to Holdner Farms. However, when settlement negotiations failed, Patricia amended her petition to assert an interest in Holdner Farms. On the eve of trial, Randal filed this action against his parents, and the dissolution action has been held in abeyance pending its final adjudication.

At trial, William did not dispute the existence of the agreement alleged by Randal. Patricia, however, argued that there was no enforceable agreement among any of the parties. Alternatively, she argued that, if such an agreement did exist, she was not a party to it and, therefore, was not bound by it. On direct examination, Randal characterized the agreement as follows:

"Q I'd like you to tell the judge what you were promised.

"A    My parents told me that if I stayed and worked the farm, the farm would be mine.

"Q    Was there a discussion during that time period about whether you would have any current ownership interest in the farm?

"A    Yes, there were.

"Q    And what was discussed about the current ownership interest?

"A    That we would take the cattle that I had and I would put them into a—we have basically a joint venture, put them into—together and run the farm as a 50/50 partnership.

"Q    And you'd be one of the 50s?

"A    And my father would be the other.

"Q    Okay. Was there discussion as to when the whole farm would go to you?

"A    Yes, there was.

"Q    What were you told?

"A    I was told that it would be upon my father's death, as it was the best way to come to me for tax purposes."

On cross-examination, Randal again testified that William "promised that if I worked the farm the farm would be mine," and that his parents promised him that he "would receive the farm." He also testified that "the original agreement was that if I worked the farm the farm would be mine."

Randal testified that, at the time of trial, he owned "100 percent [of the farm] because of the promise" his parents made to him. Additionally, Randal testified that he was "paid $1,500 every two weeks" and that he paid $500 "rent to [his] father every month" to live in a house on one of the Holdner Farms' properties. He also testified that William made the mortgage payments on the real properties out of Holdner Farms' checking account, which also contained funds derived from William's CPA partnership. Finally, Randal testified that there was no agreement between himself and William as to how profits and losses would be shared.

William also testified about the purported agreement:

"A    The agreement was that Randy would get the—we would have a 50 percent owner, myself and him. He exchanged the cattle for his interest in the cattle after Laurie had transferred the cattle, her shares to him, for the 50 percent equity in the farm properties which is real estate and equipment.

"Q    Okay. Let me just make sure that was clear. Randy would transfer his ownership of his cattle and the cattle that had been Laurie's?

"A    That is correct.

"Q    In exchange for a 50 percent ownership in what?

"A    In the real properties that were in effect in my name.

"Q    And was there further agreement as to how the farm would be operated?

"A    The farm would be operated like a partnership. We'd call it a joint venture just because of the fact it's less formal in the filing in federal and state tax documents.

"Q    Was there also an agreement as to whether Randy would have some further greater interest in the farm at a later time?

"A    That is correct. He would, at my demise, would receive any remaining interest that I would have in the properties.

"* * * * *

"Q    During your life you and Randy would have a 50/50 arrangement on the farm?

"A    That is correct.

"Q    And on your death it would all go to him?

"A    That is correct."

William testified that selling off part of the farm or borrowing against the farm for purposes unrelated to the business would violate the agreement with Randal. On cross-examination, William reiterated that "our agreement was

that [Randal would] get the property at my demise, any remaining interest that I'd have."

Other evidence was presented concerning the ownership and operation of Holdner Farms and William's involvement in the operation. In 1995 and 1996, William prepared individual financial statements for his bank in connection with a personal line of credit. Those statements disclosed that Randal held a 50 percent interest in the three parcels of real property purchased after 1977 but that William was the sole owner of the three parcels acquired before 1977. They also represented that Randal had no interest in any of the cattle or equipment used in the farming operation. In a financial statement that William submitted to the bank *after* Patricia filed the dissolution action, William represented that he held only a 50 percent interest in the cattle and the farm equipment. However, even that financial statement represented that William was the sole owner of the three parcels of property acquired before 1977. Contrary to the representations made to his bank in 1995 and 1996, William testified that he owned a half interest in all of the cattle and that Randal owned the remaining half interest. William testified that, for "tax purposes," he nonetheless attributed most of the profits from Holdner Farms to Randal and most of the losses to himself and Patricia. However, no partnership tax returns were ever prepared for the business.

Laurie testified that she was aware of an agreement regarding the ownership of Holdner Farms, but her account of the agreement was much less specific than the testimony of Randal and William. She testified that "mom and dad and Randy and I had decided that * * * Randy's interests lie in the farm and that, therefore, we should help him get established in the farm and that the farm should be his." She also testified that "Randy would assume all of the farm" upon her father's death, but that discussions about the "family venture" evolved over the course of time.

Patricia testified that she never attended a "family meeting" at which an agreement of the type described by Randal or William was reached. She testified that she did not participate in or overhear any discussion in which anyone

promised Randal that he would receive half of the real property and business in 1977 and the remainder of each upon William's death. She also testified that she was not told in 1977 about a family "partnership." Additionally, Patricia testified that she had prepared and maintained the financial records of the farming operation for about the first 10 years and, during that time, she always listed Randal as an employee, not as a partner or co-owner.

At the conclusion of the trial, the court found that Patricia's testimony was "quite credible." Although the court made no express credibility findings about any of the other parties or witnesses, it implicitly found William to be less than credible because of the way that he had dealt with Randal and Patricia. The court found that "[Patricia] * * * trusted William * * * to provide for her and she was naive in her faith." Also, that "William * * * was very careful with money spent on the family home or made available to [Patricia] for her care and that of the children. William['s] care approached miserly." The court found that "[Patricia] * * * was treated quite shabbily by William" and that William's "dealings with Randal * * * have not been appropriate to a father-son relationship." The court also found that the dealings between William and Randal about the alleged agreement were "unclear, and the fault for that belongs to * * * William," who was "motivated by a desire to maintain control[, and, to that end, he] created illusions as to what Randal's interests were." The court also found that "William * * * was the only party who knew the arrangement with [Randal] at any given time."

The court also found that "no consideration flow[ed] to [Patricia] for the alleged contract," and although Patricia "was aware of discussions between Randal and William that William intended that Randal inherit the farm," the court did "not fault [her] for failing to inquire further because she would not have been provided with any further information." The court also determined that any arrangement between William and Randal was "not a partnership, in the truest sense, but was more like a joint venture." The court expressed skepticism stemming from the conflicts between Randal's and William's descriptions of the terms of their agreement. The court noted that

"one concern that I have is that in a less guarded moment during his testimony I understood [William] to indicate that Randal was to receive whatever [William] had left at the time of [William's] death, which would be inconsistent with the position that Randal has taken."

On appeal, Randal makes two assignments of error. First, he assigns error to the trial court's findings of fact leading to the conclusion that there was no enforceable agreement among all of the parties. Second, he assigns error to the court's failure to declare that William was bound by the agreement with Randal and argues that the trial court improperly considered Patricia's equaties *vis-à-vis* William in making its decision.

Randal, as the proponent of the alleged contract, has the burden of establishing its existence and its terms. *Bernard v. Vatheuer*, 303 Or 410, 412, 737 P2d 128 (1987). In order to warrant enforcement, proof of the contract must be "clear, unequivocal and by a preponderance of the evidence." *Richardson v. Fields*, 270 Or 368, 372, 527 P2d 708 (1974). "In determining whether a contract exists and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts." *Real Estate Loan Fund v. Hevner*, 76 Or App 349, 354, 709 P2d 727 (1985).

It is evident that the trial court mistrusted William's testimony, while it explicitly found Patricia to be "quite credible." Patricia testified that "there was no [family] meeting" regarding the ownership of the farm in 1977 and that, even after 1977, William "never" talked to her about purchasing any property jointly with Randal. She testified that she found out that William and Randal had jointly purchased the Johnson's Landing property only after the fact and then only because Randal told her about it. Additionally, she discovered that Randal was a joint owner of the Sattler property only after the trial in this case began. Based upon William's exclusion of Patricia from important financial decisions, that testimony is both credible and unsurprising. The trial court's finding that, even if there was an agreement between Randal and William, Patricia neither knew about its existence nor

was a party to it is supported by its determination that Patricia's testimony was credible.

Some of the trial court's subordinate findings—for example, that there was no consideration supporting an agreement between Randal and Patricia—were not necessary to its ultimate decision. However, even if the court had made no credibility findings, its determination that there was no enforceable contract among Randal, Patricia, and William is consistent with the preponderance of evidence in the record. Apart from Randal's record ownership of an undivided one-half interest in the three parcels of property acquired after 1977, there is no written evidence of the agreement asserted by Randal. To the contrary, the written records prepared by William before the present dispute arose actually *contradict* Randal's claims. Moreover, the record title to two of the three parcels purchased after 1977 shows that they are owned by William and Randal as tenants in common.[3] As noted, the deed to the Hays property is silent with regard to the form of co-ownership between William and Randal, and the deed to the Johnson's Landing property expressly conveyed that parcel to William and Randal as tenants in common. In short, the record title to those properties reflects that they are tenants in common, *without mutual rights of survivorship*, ORS 93.180,[4] a fact that also is inconsistent with Randal's theory that he will solely own those parcels on William's death. Furthermore, as explained in greater detail below, Randal's and William's respective testimony as to the terms of the alleged agreement was not mutually consistent, although their trial positions were allied

---

[3] Because the Sattler property is subject to an unrecorded land sale contract, the deed of conveyance has not yet been recorded. However, the contract does not call for a deed creating mutual rights of survivorship.

[4] ORS 93.180 provides:

"Every conveyance or devise of lands, or interest therein, made to two or more persons, other than to a husband and wife, as such, or to executors or trustees, as such, creates a tenancy in common unless it is in some manner clearly and expressly declared in the conveyance or devise that the grantees or devisees take the lands with right of survivorship. Such a declaration of a right to survivorship shall create a tenancy in common in the life estate with cross-contingent remainders in the fee simple. Joint tenancy is abolished and the use in a conveyance or devise of the words 'joint tenants' or similar words without any other indication of an intent to create a right of survivorship shall create a tenancy in common."

against Patricia. Finally, Randal's theory requires us to assume, improbably, that Patricia—a homemaker spouse—made an agreement that essentially disenfranchised her of any appreciable interest in substantial assets of a long-term marriage. Such an agreement would defy common sense. In sum, the trial court did not err in finding that Patricia was not a party to a contract or enforceable promise as alleged by Randal.

■     We turn to Randal's second assignment of error, in which he argues that the trial court erred in failing to recognize and enforce the purported agreement between William and himself. Once again, Randal has the burden to prove the existence and terms of the alleged contract by a "clear, unequivocal * * * preponderance of the evidence." *Richardson*, 270 Or at 372.

The preponderance of the evidence does not support Randal's claim. The most telling evidence demonstrates that, after 1977, Randal paid rent to live on property that he supposedly owned; that he accepted wages for the work he performed on the farm; that the payments to Randal bore no relationship to the profits or losses of the business; that William had exclusive control over the amount and frequency of the payments; and that the payments were adjusted on an irregular basis as William deemed appropriate based upon Randal's financial circumstances.

Further, the evidence demonstrated that William did not treat Randal as an equal owner of Holder Farms. Without regard to the actual distribution of revenue from the business, William attributed virtually all of the taxable profits to Randal while attributing virtually all of the deductible losses to himself. Patricia's expert witness persuasively testified that, if Randal and William had owned Holdner Farms equally, the taxable profits and losses of the business normally would have been allocated accordingly.

On his bank financial statements, William represented that Randal was a co-owner of only three of the six parcels of land used by Holdner Farms and that William owned all of the cattle and equipment. Also, William never conveyed to Randal by written instrument any interest in the home place, the Chapman property, or the Dutch Canyon

property. It is true that the three parcels acquired after 1977 were deeded jointly to William and Randal; however, that evidence cuts both for and against Randal. Although it shows that there was a financial relationship *of some sort* between Randal and William, it does not explain why, if Randal's version of the agreement were accurate, William did not convey a similar interest to Randal in the other three parcels used in the business. Nor does it explain why there are no survivorship provisions in the deeds conveying the three parcels that William and Randal acquired after 1977. As to the three parcels acquired before 1977, and the cattle and other assets of Holdner Farms, William attributed ownership status to Randal only when it was in William's financial interest to do so. This litigation, in which William has a strong financial motive to remove Holdner Farms from the marital estate to be divided in the pending dissolution action, furnishes a good example of such convenient attribution.

Finally, Randal and William did not testify consistently as to the nature of Randal's interest in Holdner Farms. As noted, Randal testified that, at the time of trial, he believed that he owned "100 percent" of the assets of Holdner Farms because of his parents' alleged promise. William, on the other hand, testified that Randal would receive "any remaining interest" in Holdner Farms that William owned at his death.[5] Such an interest would amount to no more than an expectancy, subject to depletion or diversion at William's whim. William's testimony is consistent with his practice of dealing with Holdner Farms as if it were his own, attributing ownership to Randal only when convenient. Further, William's and Randal's conflicting impressions of the nature of Randal's interest in Holdner Farms weighs against the existence of the alleged agreement.

Although Laurie's testimony seemingly contradicted Patricia's testimony, we do not find it to be particularly helpful. Although Laurie expressed certainty that there was *an*

---

[5] As noted, during its oral ruling, the trial court noted that William made this statement in "a less guarded moment during his testimony." That comment suggests that the court deemed the statement to be more credible than the balance of William's testimony. Therefore, we too give it greater weight based on the court's implicit credibility finding. *See Gorzeman v. Thompson*, 162 Or App 84, 90, 986 P2d 29 (1999).

agreement, she did not identify any of its terms, nor could she say when the agreement was made, acknowledging only that it "evolved over time." Her testimony otherwise neither supported the existence nor helped establish the terms of *the purported* agreement.[6]

Randal remonstrates that, in spite of the evidence we have emphasized, we should give "effect to the reasonable intentions of the parties." Randal relies on *Van v. Fox*, 278 Or 439, 564 P2d 695 (1977), where the Supreme Court said:

" 'The law does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained.' " *Id.* at 445 (quoting *Howard v. Thomas*, 270 Or 6, 10, 526 P2d 552 (1974)).

Put differently, Randal argues that, if he and William intended to enter into an agreement on terms similar to those outlined by either of them, we should enforce that agreement even if all of the terms are not certain. Randal's argument is misplaced on two counts. First, it assumes that the preponderance of the evidence demonstrated that Randal had anything other than an expectancy interest in the assets of Holdner Farms beyond his co-tenancy ownership of the three parcels of property acquired after 1977. It did not. The second point confirms the first. The material terms of the agreements at issue in *Howard* and *Van* were more definite and unequivocal than is the case here.

In *Howard*, the plaintiff sought and obtained specific performance of an earnest money receipt in which the defendant seller had agreed to sell a ranch to the plaintiff. The written agreement specified the amount and the due date of the down payment, the maximum amount of the annual payment, and the interest rate on the deferred balance of the purchase price. Here, of course, there is no written agreement, and the terms of any oral agreement are unclear in view of the inconsistent evidence presented at trial.

---

[6] Other evidence that we have not discussed was presented at trial, which cuts marginally in one direction or another. Although we have considered all of the evidence in the record in reaching our conclusion, we see no tangible benefit in discussing all of it in this opinion.

*Van* also is distinguishable. There, the plaintiffs sought specific performance of a "joint venture agreement." The plaintiffs relied on a "letter of intent" to establish the terms of the alleged contract. The Supreme Court acknowledged that the letter of intent did not define the terms of the agreement precisely. However, the court enforced the agreement because it found that the parties "share a common understanding of their respective obligations under the joint venture agreement." *Van*, 278 Or at 442. *Van*, unlike this case, also involved a writing that set forth at least some of the material terms of the agreement.[7] Randal's, William's, and Laurie's testimony fell far short of the evidence in *Van*, where a writing was supplemented by evidence at trial supplying "additional, material terms" that made the agreement enforceable. *Id.* at 446. Randal established that he worked hard for Holdner Farms, that he owned as a tenant in common an undivided one-half interest in three parcels of land used by Holdner Farms, and that he expected to own the business at some point in time. Unlike in *Howard*, the remaining evidence was conflicting, at best. Because Randal's evidence did not establish by a preponderance of the evidence the contract he alleged, *Howard* and *Van* do not meaningfully inform our decision here.

The evidence of the post-1977 business relationship between William and Randal suggests that there was an arrangement *of some kind* between them. However, it does not establish by a preponderance that—apart from his co-ownership of the three parcels acquired after 1977—Randal held an interest in the other real and personal property utilized in the farming operation. The trial court properly considered William's habit of manipulating Randal and keeping Patricia uninformed so as to suit his own financial interests.

---

[7] At trial, Patricia asserted that there was no enforceable agreement because of the statute of frauds, ORS 41.580(1)(e), which requires a signed writing to evidence an agreement for the sale of land. Randal asserted that a will executed by William in 1984 and republished by codicil in 1994 satisfied this writing requirement. Patricia does not renew on appeal her argument that William's will was insufficient because it did not adequately describe the alleged agreement and because, while William was still alive, it did not yet have any effect. Because we conclude that there was no enforceable agreement regardless of the statute of frauds, and because that argument is not developed on appeal, we do not discuss it here.

Those interests loom particularly large to the extent that a judicial declaration that Randal owns an interest—whether fractional or whole—in all of the assets of Holdner Farms, would preclude the court in the pending marital dissolution action from making a contrary determination. Our recognition of William's motive in weighing the other evidence, does not improperly inject Patricia's equities into the calculus; instead, it informs our determination of whether Randal and William made the alleged agreement at all. The preponderance of the evidence shows they did not.

Affirmed.